1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DARIO L. CANNON,

           Plaintiff,

    v.

GERALD JANDA,

           Defendant.

Case No. 13-cv-02419-TEH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      This matter is before the Court on Dario Cannon's petition for a writ of habeas corpus. The Court has carefully considered the arguments of the parties in the papers submitted. Pursuant to 28 U.S.C. § 2254(e)(2) and Habeas L.R. 2254-7 & 2254-8, the Court finds this matter suitable for resolution without an evidentiary hearing or oral argument. The petition is DENIED, for the reasons set forth below.

**BACKGROUND**

      On October 3, 2008, Germaine Galloway was shot multiple times while seated in a parked car in Oakland, California. Twenty days later, Galloway died as a result of his wounds. In the car with Galloway were Rhonika Johnson and Adrienne Ard. Witnesses Alvin Jackson and Kenneth Maxwell were nearby at the time of the shooting.

      On December 3, 2009, an Alameda County, California jury convicted Petitioner of Galloway's murder, assault with a semiautomatic firearm, and possession of a firearm by a felon. Petitioner was sentenced to 50 years to life in state prison. The conviction was affirmed by the California Court of Appeal on May 15, 2012, in an unpublished opinion. On August 8, 2012, the California Supreme Court declined to review the appellate court's decision affirming Petitioner's conviction. Petitioner's state habeas petition was also denied by the California Supreme Court on November 30, 2013. On January 7, 2014, Petitioner was denied certiorari by the United States Supreme Court.

Petitioner now seeks habeas relief from this Court, challenging various aspects of his trial, including the selection of his jury, the allegedly coerced nature of a government witness's testimony, and the adequacy of his representation. Petitioner also brings a freestanding innocence claim, based on evidence that was not introduced at trial.

**STANDARD OF REVIEW**

Habeas petitions are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a petitioner is entitled to federal habeas relief only if he can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2); *Greene v. Fisher*, 132 S. Ct. 38, 44 (2012).

AEDPA creates a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). A state court's decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or arrives at a different result in a case that "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Williams (Terry) v. Taylor*, 529 U.S. 362, 405–06 (2000). "The state court's application of clearly established law must be objectively unreasonable, not just incorrect or erroneous." *Crittenden v. Ayers*, 624 F.3d 943, 950 (9th Cir. 2010) (internal quotation marks omitted). Further, a federal court must "presume the state court's factual findings to be correct, a presumption the petitioner has the burden of rebutting by clear and convincing evidence." *Id.*

This standard is intentionally "difficult to meet," because habeas is intended to function as a "guard against extreme malfunctions in the state criminal justice systems, not as a means of error correction." *Greene*, 132 S. Ct. at 43 (citations omitted). A petitioner

United States District Court
Northern District of California

2

United States District Court
Northern District of California

must therefore show that the "state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

**DISCUSSION**

Petitioner presents five claims for habeas relief in his petition to this Court. Specifically, Petitioner contends: (1) his Sixth Amendment right to a fair trial was violated because the prosecutor improperly exercised peremptory challenges against five black females from the jury venire; (2) the testimony of an eyewitness was coerced because of her detention, and that Petitioner suffered ineffective assistance of counsel because of counsel's failure to object to that witness's testimony; (3) Petitioner received ineffective assistance of counsel when counsel failed to object to the admission of other testimony, including inadmissible hearsay and opinion testimony; (4) newly-discovered evidence shows that Petitioner is actually innocent; and (5) Petitioner suffered cumulative prejudice. In evaluating these claims, the Court reviews the last reasoned state court decision, which in this case is the opinion of the California Court of Appeal. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).

**I.    Petitioner's *Batson/Wheeler* Claims Fail.**

Petitioner is African-American.  At trial, Petitioner claimed that the prosecutor's peremptory challenge of five black female venirepersons was motivated by racial discrimination in violation of his constitutional right to a fair trial as articulated in *Batson v. Kentucky*, 476 U.S. 79 (1986), and *People v. Wheeler*, 22 Cal. 3d 258 (1978).  Am. Pet. at 12.[1]  Neither party disputes that Petitioner made a timely *Batson* motion.  The trial court

---

[1] *Wheeler* is the California state law equivalent of *Batson*.  *Boyd v. Newland*, 467 F.3d 1139, 1144 (9th Cir. 2004).  The Court will hereafter refer to the *Batson/Wheeler* claim as the *Batson* claim.

found that Petitioner made a *prima facie* case of discrimination, heard the prosecutor's allegedly race-neutral reasons for using the peremptory challenges, and then rejected Petitioner's *Batson* motion upon finding that the prosecutor's actions were not motivated by racial discrimination.  On the record, the trial court discussed some, but not all, of the prosecutor's expressed reasons for the peremptory challenges, and found the prosecutor's explanations to be credible and race-neutral.

On direct appeal, Petitioner argued that the trial court incorrectly applied an outdated legal standard in denying his *Batson* claim.  According to Petitioner, the trial court only looked for one race-neutral reason to justify the prosecutor's actions, instead of considering whether race was a "substantially motivating factor" as required by more recent case law.  The state appellate court rejected this argument and held that the trial court adequately applied controlling law and properly denied the *Batson* motion.  Ex. 7 to Answer at 20 (Docket No. 16).  On collateral review, Petitioner now argues that the state appellate court's decision, like that of the trial court, was contrary to, or involved an unreasonable application of, Supreme Court precedent because it failed to address all of the prosecutor's reasons individually and determine whether racial discrimination was a substantially motivating factor.  Am. Pet. at 15-21.

For the following reasons, the Court rejects Petitioner's claims, finding that the state appellate court's decision was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  The Court additionally finds that the appellate court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, Petitioner's *Batson* claim does not entitle him to habeas relief.

**A. The state appellate court correctly rejected Petitioner's claim that the trial court used the wrong legal standard.**

A federal court's habeas analysis under AEDPA first inquires whether the state courts' last reasoned decision was "contrary to . . . clearly established Federal law, as

determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases" or arrives at a different result in a case that "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court."  *Williams*, 529 U.S. at 405-06.  If the state court applies a legal standard that contradicts clearly established federal law, a federal court will review the petitioner's claims *de novo*, applying the correct legal standard to determine whether the applicant is entitled to relief.  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

The "clearly established federal law" as it pertains to Petitioner's *Batson* claim is *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny.  *Batson* established that a prosecutor's use of a peremptory strike against a potential juror on the basis of his or her membership in a protected class[2] is a violation of a criminal defendant's constitutional rights to a trial by a jury drawn from a representative cross-section of the community and equal protection of the law.  *Batson*, 476 U.S. at 79, 89.  A *Batson* analysis is composed of three steps.  First, where a defendant believes a prosecutor has improperly exercised a peremptory challenge, he must make a *prima facie* case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Id.* at 93-94.  Second, once the defendant has made out a *prima facie* case, the "burden shifts to the State to explain adequately the racial exclusion" of the prospective juror by offering permissible race-neutral justifications for the strikes.  *Id.* at 94.  Finally, in light of the parties' submissions, the trial court must determine whether the defendant has shown that a peremptory strike was "motivated in substantial part by discriminatory intent."  *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008).

Petitioner specifically contends that the trial and appellate courts "flouted the Supreme Court's *Batson* jurisprudence" by failing to employ what he calls the "*Snyder*

---

[2] Black women are a protected class under California state law.  *People v. Motton*, 39 Cal. 3d 596, 605 (1985).

United States District Court
Northern District of California

1   Test." Am. Pet. at 13.  In *Snyder*, the United States Supreme Court held that "a

2   peremptory strike shown to have been motivated in substantial part by discriminatory

3   intent could not be sustained . . . ." *Snyder*, 552 U.S. at 485.[3]  Petitioner argues that the

4   state courts acted contrary to *Snyder* by incorrectly applying outdated case law that

5   allowed courts to "uphold a peremptory challenge as long as it found one race-neutral

6   reason for the challenge to each black juror, regardless of what other reasons were stated,

7   and regardless of whether or not any of those other reasons were race-based." Am. Pet. at

8   13.  Petitioner's claim is predicated on two arguments.  First, Petitioner takes issue with

9   the trial court's citation of allegedly outdated cases.  Second, Petitioner finds fault in the

10  fact that the trial court only discussed some, instead of all, of the prosecutor's reasons for

11  exercising the peremptory strikes.  On direct appeal, and now on collateral review,

12  Petitioner asks the courts to draw the inference that this means the trial court was merely

13  looking for one race-neutral justification for the peremptory challenges, and failed to

14  consider whether racial discrimination was a "substantially motivating factor" for the

15  prosecutor's actions.

16          The California Court of Appeal found Petitioner's argument on this point

17  unpersuasive, and affirmed the trial court's decision.  After reviewing the trial court record

18  as a whole, the appellate court explained that the legal standard applied by the trial court

19  was not contrary to *Snyder* because the trial court did not find *any* of the prosecutor's

20  reasons to be race-based, and therefore *could not have* found that racial discrimination was

21  a substantially motivating factor for the challenges.  Ex. 7 to Answer at 10.  The appellate

22  court further noted that the trial court appropriately cited three of the most recent United

23  States Supreme Court cases and a recent California Supreme Court decision regarding

24  *Batson* motions, indicating that the trial court understood and applied the correct legal

25  standard.  *Id.*

26  _____

27  [3] It should be noted, however, that the Court left for another day the decision of whether,
    upon such a finding of discrimination as a substantial or motivating factor, the prosecutor

28  has the opportunity to defend the challenge by showing that "this [discriminatory] factor
    was not determinative." *Snyder*, 552 U.S. at 485.

United States District Court
Northern District of California

1    This Court agrees that the trial court applied the correct legal standard to

2    Petitioner's *Batson* motion.  Petitioner fails to adequately support his contention that the

3    trial court's decision not to individually address each and every one of the prosecutor's

4    reasons was contrary to the legal standard established by *Snyder*.  Nowhere does the

5    Supreme Court, in that decision or any other, require a trial court to explicitly review, on

6    the record and in open court, every one of a prosecutor's reasons individually before

7    finding that the peremptory challenges were not motivated by racial discrimination.  The

8    law only requires a court to consider all of the available evidence, including the parties'

9    submissions, before deciding whether the petitioner has shown purposeful discrimination

10   by the prosecutor, *i.e.*, that "race was a substantial motivating factor."  *See Batson*, 476

11   U.S. at 98; *Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010); *Cook v. LaMarque*, 593

12   F.3d 810, 815 (9th Cir. 2010).

13   Further, nothing in the record suggests that the trial court found even one of the

14   prosecutor's nearly two dozen reasons to be racially motivated.  Consequently, Petitioner's

15   own description of the context in which the purported "*Snyder* Test" should be applied

16   counsels against its application in this case.  In his Traverse, Petitioner states that the

17   *Snyder* Test, composed of an individual analysis of each reason given for the peremptory

18   challenge, should be used "when a prosecutor gives multiple reasons for challenging a

19   juror, and when some are arguably race-neutral, and when some are race-based . . . ."

20   Traverse at 1.  Neither the trial court nor the state appellate court found *any* of the

21   prosecutor's reasons to be race-based.  Instead, the trial court reasonably addressed what it

22   considered to be the substantial reasons offered by the prosecutor, which is at the very least

23   within the threshold of analysis that would be required by *Snyder*'s "substantially

24   motivating factor" test, if one assumes that this is the type of case in which it should be

25   applied.  Ideally, a trial court would discuss all of the prosecutor's reasons in turn,

26   providing appellate and federal courts with an exhaustive record of its analysis regarding

27   the motivations underlying the exercise of peremptory challenges.  However, this Court

28   recognizes that such a detailed analysis on the record is not always practical during trial,

7

and the Court has been directed to no authority that requires the trial court to provide such a record for appellate and collateral review.

Moreover, Petitioner's argument that the trial court cited partially outdated cases is neither dispositive nor persuasive.  It is not enough that the trial court merely cites to old cases that contain a mixture of good and bad law; rather, the last-reasoned state court decision itself must be "contrary to, or involve[ ] an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).  The state appellate court found Petitioner's argument regarding these allegedly erroneous citations unconvincing in light of the entire record, especially when viewed within the context of the actual analysis undertaken by the trial court and the ultimate decision on Petitioner's *Batson* motion.  This Court agrees.  Where no racially discriminatory motivation has been identified, and all substantial justifications for the peremptory challenges have been determined race-neutral, the distinction between *Snyder* and the cases cited by the trial court is meaningless.  In other words, the trial court could not have engaged in the outdated "mixed motive analysis" suggested by those cases because the trial court *did not find any mixed motives*. Petitioner's reiteration of his concerns about these citations fails to provide sufficient evidence that the appellate court's determination on this point was objectively unreasonable.  *See Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011); *Crittenden*, 624 F.3d at 950.

**B. The state appellate court's factual determinations were reasonable.**

That the California Court of Appeal's decision was not "contrary to" clearly established federal law does not end the Court's inquiry under AEDPA.  "Once we conclude that the trial court has conducted an adequate inquiry under *Batson*, our review must shift from § 2254(d)(1) to a review of the reasonableness of the state court's factual determinations under § 2254(d)(2)."  *Murray v. Schriro*, 745 F.3d 984, 1006 (9th Cir. 2014).

Neither party disputes that Petitioner satisfied his burden to make a *prima facie* showing of purposeful discrimination, as is required at *Batson*'s step one. As previously explained, once that showing was made, the burden shifted to the prosecutor to offer race-neutral justifications for each strike. Those justifications do not have to be "persuasive, or even plausible"; at the second step of *Batson*, "the issue is the facial validity of the prosecutor's explanation." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (internal quotation marks omitted). "The state trial court was then required, at step three, to evaluate the persuasiveness of the prosecutor's articulated reasons, and determine whether the defendant ha[d] established purposeful discrimination." *Castellanos v. Small*, 766 F.3d 1137, 1147 (9th Cir. 2014) (internal citations and quotation marks omitted). In this last step, the trial court was obligated to "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93. In doing so, a comparative juror analysis between the challenged prospective jurors and the empaneled jurors can serve as "evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

However, "*Batson* and the cases that follow it do not require trial courts to conduct a comparative juror analysis." *Murray*, 745 F.3d at 1005. Instead, a formal comparative analysis can be conducted by a federal court "to review the *reasonableness* of the factual determinations underlying the state court's decision." *Id.* Where the state trial and appellate courts did not undertake a comparative juror analysis on the record, a federal court must do so on collateral review. *Castellanos*, 766 F.3d at 1147 (citing *Murray*, 745 F.3d at 1004-07). In conducting this comparative analysis, *Jamerson v. Runnels*, 713 F.3d 1218 (9th Cir. 2013), provides guidance:

> To begin, we must perform in the first instance the comparative analysis that the state court declined to pursue. Then, we must reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine. In essence, we must assess how any circumstantial evidence of purposeful discrimination

9

1
2

> uncovered during the comparative analysis alters the evidentiary balance and whether, considering the totality of the evidence, the state court's credibility determination withstands our doubly deferential review.

3 *Id.* at 1225-26.

4   In addition to undertaking a comparative juror analysis, the Court must review the

5 reasonableness of the state appellate court's other factual determinations upon which its

6 decision to affirm the trial court was made. As this inquiry is limited to the "evidence

7 presented in the State court proceeding," § 2254(d)(1), this review is "limited to the record

8 that was before the state court that adjudicated the claim on the merits." *Cullen v.*

9 *Pinholster*, 131 S. Ct. 1388, 1398 (2011).

10   Because this Court has determined that the state courts did not apply a legally

11 defective standard, when reviewing the decision of the California Court of Appeal this

12 Court must apply a "doubly deferential" standard of review. First, the Court must defer to

13 the California Court of Appeal in accordance with the requirements of AEDPA. *See, e.g.*,

14 *Harrington*, 131 S. Ct. at 786-87 (holding that a petitioner must show that the "state

15 court's ruling on the claim being presented in federal court was so lacking in justification

16 that there was an error well understood and comprehended in existing law beyond any

17 possibility for fairminded disagreement"). Second, in reviewing the California Court of

18 Appeal's decision, this Court must also recognize that the state appellate court itself

19 employs a deferential standard of review in analyzing the trial court's decision. As

20 explained by the appellate court:

21   This deferential standard of review gives the trial court great responsibility for ferreting out discrimination. At *voir dire*, the
22   trial court personally witnesses the totality of the factual inquiry, including the demeanor and tone of voice of both the
23   prosecutor and the prospective juror. It observes the unspoken atmosphere in the courtroom. Thus, the trial court is best able
24   to place the prospective jurors' responses in context. (*Lenix*, *supra*, 44 Cal.4th at pp. 626-627; *see Snyder*, *supra*, 552 U.S.
25   at p. 477.) The trial court makes credibility determinations based on verbal and nonverbal communications. (*See Mills*,
26   *supra*, 48 Cal.4th at p. 176; *Lenix*, *supra*, 44 Cal.4th at pp. 613, 622.) We defer to those credibility determinations, whether
27   express or implied. (*See Mills*, *supra*, 48 Cal.4th at pp. 175-176; *Lenix*, *supra*, 44 Cal.4th at p. 614.) Even so, this
28   deferential standard of review remains a meaningful one on

10

1
2
3
4

> appeal.  The reasons given by a prosecutor for the exercise of a peremptory challenge stand or fall on their plausibility. (*Miller-El v. Dretke*, *supra*, 545 U.S. at p. 252; *Lenix*, *supra*, 44 Cal.4th at p. 621.)  We review the plausibility of the stated reasons on the basis of the entire record.  (*Lenix*, *supra*, 44 Cal.4th at p.621; see *Miller-El v. Dretke*, *supra*, 545 U.S. at p. 252.)

5
6
7
8
9

Ex. 7 to Answer at 11.  Consequently, in reviewing the state appellate court's decision regarding Petitioner's *Batson* motion, this Court can only grant habeas relief where it finds that the state appellate court's own exercise of deference to the trial court resulted in a clearly unreasonable determination.  With this highly deferential standard in mind, the Court turns to the specifics relating to each of the five challenged venirepersons.

10
11

### 1.  Ms. Ali

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

According to the Court's assessment of the trial record, the prosecutor stated five, perhaps six, reasons for challenging Ms. Ali: (1) The "primary reason" was that Ms. Ali was having a "tough time getting through the [initial] 14 questions."  (2) She was "extremely vague" about which family members had been arrested.  (3) She had an "extensive connection" to the criminal justice system, and "not on the law enforcement side of it."  (4) She was not sure if she could serve.  (5) She said she may have to interrupt the proceedings frequently due to medical problems.  And possibly also (6) "She was born in 1937, and given her age, I believe that is the reason I could have sworn that I did challenge her for cause for some of the things that she said, but I don't want to speak to that unless I have a clear record on it."  5 Aug. RT 833-34.  Regarding reason six, Petitioner enumerates this as a separate reason given for the peremptory challenge of Ms. Ali, while the State and the California Court of Appeal group the issue of age with Ms. Ali's difficulty answering the jury questionnaire.  The transcript does not resolve this discrepancy, and even appears to suggest that the Prosecutor was not using Ms. Ali's age as a basis for her peremptory challenge at all, but was instead noting it as a possible reason for a challenge for cause.  Having noted this point of ambiguity, the Court will nonetheless include this sixth "reason" in its *Batson* analysis out of an abundance of caution.

United States District Court
Northern District of California

The trial court accepted the prosecutor's reasons for challenging Ms. Ali as race-neutral.  First, regarding Ms. Ali's difficulty answering the jury questionnaire, the court noted: "Ms. Ali was slow and vague.  She did appear to have a hard time with the questions and the 12 questions posed by the Court's single-page questionnaire, and that was my observation as well.  Ms. Ali did have some level of difficulty in dealing with these questions."  5 Aug. RT 858.  Second, regarding Ms. Ali's vague answers about which family members had been arrested, the court noted: "Her answers were vague, and I made notes to that effect of my own, which I have reviewed, as [the prosecutor] was speaking and matching them with my own recollection."  *Id.*  Finally, regarding Ms. Ali's extensive negative connections to the criminal justice system, the court noted:

> I also note that Ms. Ali . . . has extensive connections with the criminal justice system.  That is, her family does, not the juror, herself, but her family does.  Many family members were arrested, have served time.  She has a brother convicted of manslaughter.  She stated that her brother was not fairly treated, and that's a factor that the courts have indicated, not only contact with the criminal justice system, but negative contact."

5 Aug. RT 858-59.  The trial court explained that negative contacts with the criminal justice system, especially when the juror feels those contacts involved unfair treatment, are legitimate considerations.  *Id.*  Consequently, the trial court considered and validated three of the five (or potentially six) reasons offered by the prosecutor.

Applying due deference, the California Court of Appeal found that substantial evidence supported the trial court's denial of the *Batson* motion as to Ms. Ali.  In reviewing the trial court's decision, the state appellate court wrote:

> The trial court's own observations were consistent with the prosecutor's - that Ms. A. had difficulty responding to questions, that she gave vague answers and that her family had had extensive, negative contacts with the criminal justice system.  One brother had been convicted of manslaughter and she did not believe that he had been fairly treated.  A negative experience of the criminal justice system is a valid reason for a prosecutor to exclude a prospective juror.  (See *Lenix, supra*, 44 Cal.4th at p. 628.)

1

2

3

4

5

6
>Concern about a prospective juror's ability to perform the
>duties of a juror is clearly another race-neutral reason for
>exclusion.  Ms. A.'s manner is the sort of nonverbal cue that is
>best evaluated by a judge observing voir dire.  (*Mills, supra,* 48
>Cal.4th at p. 176; *Lenix, supra,* 44 Cal.4th at pp. 613, 622.)
>The trial court's assessment of Ms. A.'s conduct and of the
>sincerity of the prosecutor's race-neutral reasons for excluding
>her from the jury are entitled to deference on appeal.  (See,
>e.g., *Mills, supra,* 48 Cal.4th at pp. 175, 184-185; *Lenix, supra,*
>44 Cal.4th at pp. 613-614, 626.)  Substantial evidence supports
>its denial of the Batson-Wheeler motion as to Ms. A.  (See,
>e.g., *Mills, supra,* 48 Cal.4th at p. 185).

7

8

Ex. 7 to Answer at 14.

9

10
         Applying the appropriate, doubly deferential standard of review, this Court finds

11
that the determinations of the state appellate court were not objectively unreasonable.

12
First, the state appellate court appropriately applied deference to the trial court in

13
determining that the prosecutor's claim that Ms. Ali had difficulty answering the jury

14
questionnaire was a race-neutral reason for exercising a peremptory challenge.  "The trial

15
court has a pivotal role in evaluating *Batson* claims."  *Snyder*, 552 U.S. at 477.  This is

16
often the case because, in evaluating *Batson* claims, race-neutral challenges often invoke a

17
juror's demeanor, "making the trial court's first-hand observations of even greater

18
importance."  *Id.*  This Court, like the appellate court, is not in the position to second guess

19
the trial court's assertion that it independently observed Ms. Ali's difficulty answering the

20
jury questionnaire, which is a reason that would not ordinarily be well-reflected in a court

21
transcript.  As such, the state appellate court was correct in deferring to the trial court's

22
first-hand observations about Ms. Ali's demeanor.

23
         Second, the Court notes that the trial court also independently confirmed the

24
prosecutor's claim that Ms. Ali gave vague answers in response to questions about which

25
family members had been arrested.  Additionally, the transcript corroborates this account.

26
When asked about family members who had been arrested, Ms. Ali answered, "I'm sure

27
that I do have family members that's been arrested, that has a criminal past.  I have a

28
brother who passed."  2 Aug. RT 294.  Later, in response to questioning by the prosecutor,

she clarified that her brother was convicted of manslaughter 30 years earlier, and that her

United States District Court
Northern District of California

13

son was arrested and acquitted of a drug offense. *Id.* at 294, 299-300. "It's a big family," she said, "[t]here might have been some more arrested, but I don't know." *Id.* at 300. Finally, she later corrected herself and said that her brother had committed manslaughter 40 years earlier. *Id.* at 329. She also indirectly answered the prosecutor's question regarding whether her brother had been treated fairly by the system. *See id.* at 300-301. It is certainly within the realm of reasonable judgment for the prosecutor and trial court to find that this series of indirect, equivocal responses to a simple, direct question were "vague," and could give a prosecutor reason to worry about the juror's opinion of, and connections to, the criminal justice system.

Third, in evaluating the prosecutor's claim that Ms. Ali had negative contacts with law enforcement, the Court must undertake a comparative juror analysis in order to determine whether the appellate court made a reasonable determination. Petitioner points out that four seated jurors also had relatives or close friends with felony histories. Am. Pet. at 23-24. On this basis, he claims that when a prosecutor challenges a minority juror for a characteristic that applies equally to a seated white juror, this establishes pretext, *Miller-El*, 545 U.S. at 248, and that the "prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent." *Id.* at 24 (quoting *Snyder*, 552 U.S. at 485. However, an actual comparison between Ms. Ali and these four seated white jurors is weak, and does not evince discriminatory intent.

Juror 5's son was arrested in 2000 for possession of methamphetamine, and he served time in jail, instead of prison like Ms. Ali's brother. 4 Aug. RT 741-44. Afterwards, the son returned to college and finished his degree. *Id.* Importantly, Juror 5 felt that his son was treated fairly by the judicial system, and that the experience was a good lesson for his son. *Id.* Conversely, Ms. Ali refused to give a straight answer to the prosecutor's repeated question of whether she felt that her brother had been treated fairly and/or wrongly convicted. *See* 2 Aug. RT 300 (responding to these questions by saying that her brother claimed he was using self-defense, that a witness against him had turned state's evidence, and that he had never been in trouble before). Unlike Ms. Ali, Juror 5

United States District Court
Northern District of California

United States District Court
Northern District of California

1   was not vague answering questions about his son's expereince with the criminal justice

2   system.  *See Cook*, 593 F.3d at 817 (finding as weak a comparison between challenged

3   juror and seated jurors who were candid with court and accurate about description of their

4   relatives' criminal history).  Finally, Ms. Ali had numerous family members that had been

5   arrested; Juror 5 did not.

6           Juror 2's brother had been arrested for possession a small amount of marijuana 35

7   years earlier.  1 Aug. RT 203-09.  However, Juror 2, unlike Ms. Ali, said that his brother

8   had been treated fairly by the criminal justice system, perhaps even "too fairly."  *Id.*

9   Additionally, like Juror 5, but unlike Ms. Ali, Juror 2 did not provide vague answers to

10  questions relating to these issues.  While the temporal distance between that crime and the

11  jury selection was similar to that between Ms. Ali's brother's crime and the jury selection,

12  that is where the similarities end.  Unlike Ms. Ali, Juror 2 did not have other criminal

13  connections, and the severity of the crime committed by Juror 2's son does not approach

14  that of the one committed by Ms. Ali's brother.

15          Juror 10 had a college friend that was arrested twelve years earlier for drug

16  possession and counterfeiting.  4 Aug. RT 700-05.  He believed that his friend pled guilty

17  to the charges and that he treated fairly by the judicial system.  *Id.*  In addition to the

18  fact that Juror 10 was not vague in his answers regarding these matters, it is a weak

19  comparison between the crime of a college friend and those of one's brother, son, and

20  potentially other family members.

21          Juror 11 had a nephew, through her husband, who lived in another state and had

22  recently been arrested for a DUI in which a passenger in his car was killed.  3 Aug. RT

23  413-16.  She had limited knowledge about the disposition of the matter, but believed that

24  he had not yet been charged.  *Id.*  She told the trial court that she felt he was being treated

25  fairly by the system.  *Id.*  As with the other jurors, the comparison between Juror 11 and

26  Ms. Ali is weak.  While it is true that this incident might be classified as vehicular

27  manslaughter, which is similar at least in title with the crime committed by Ms. Ali's

28  brother, the nephew's case was still in a nascent stage, and the Juror's only real connection

1   to the alleged crime is that she had spoken with the nephew's parents, to whom she was

2   related only by marriage.  *Id.*  Further, it is again clear that Juror 11 felt that her nephew

3   was being treated fairly, as opposed to Ms. Ali's suggestively negative opinion of her

4   brother's treatment.

5       The Court is not convinced that any of these seated jurors provide a compelling

6   comparison showing pretext.  In an effort to overcome the weakness of these comparisons,

7   Petitioner cites *Miller-El* for the proposition, "A *per se* rule that a defendant cannot win a

8   *Batson* claim unless there is an exactly identical white juror would leave *Batson*

9   inoperable; potential jurors are not products of a set of cookie cutters."  545 U.S. at 247

10  n.6.  Petitioner's statement of law is correct.  However, even under a most forgiving

11  standard, the comparisons are insufficient to support a finding of pretext on the part of the

12  prosecutor or unreasonableness on the part of the state courts.

13      Fourth, while the trial court did not expressly address the prosecutor's claim that

14  Ms. Ali was not sure if she could serve, this Court finds that this reason was similarly race-

15  neutral.  Petitioner argues any claim by the prosecutor that Ms. Ali "wasn't sure if she

16  could serve" is unsupported by the transcript and thus pretextual.  Am. Pet. at 25.

17  However, when asked if she would be able to decide whether petitioner was guilty of

18  murder, she said, "I'm pretty sure I will."  2 Aug. RT 304.  This answer indicates a

19  reasonably uncomfortable degree of uncertainty about Ms. Ali's ability to carry out the

20  fundamental task of a juror in this case.  Ms. Ali also said that she was not sure if she could

21  carry on as a juror in light of her medical condition.  2 Aug. RT 331.  Because the

22  prosecutor and trial court were in a better position to assess Ms. Ali's demeanor when she

23  answered these questions, and because Ms. Ali's answers give reasonable cause for

24  concern, the Court finds that Petitioner has failed to expose any pretext for race-based

25  motivation.

26      Fifth, the Court reviews the prosecutor's claim that she was concerned Ms. Ali's

27  medical issues might interrupt the trial proceedings.  5 Aug. RT 833.  During *voir dire*,

28  Ms. Ali was asked if she had any "pressing problems, anything that would probably

United States District Court
Northern District of California

16

distract [her] if [she] were selected as a juror[.]" 2 Aug. RT 330. She responded that she did have "a few" of such pressing problems that might distract her, most importantly indicating that she was diabetic and would have to drink fluids and use the bathroom frequently, which by her own account might interrupt the proceedings. *Id.* at 331-33. She explained, "If I drink a lot of fluids, I have to run out to the ladies' room." 2 Aug. RT 332. Petitioner now argues that nobody told Ms. Ali that she could use the bathroom during breaks, which would prevent any interruptions. Am. Pet. at 25. The record does not support this claim. The prosecutor in fact informed Ms. Ali, "I know that Your Honor will allow you to get up and stretch and do some of the things and probably do intakes of fluids and whatever is necessary . . . for you to do." 2 Aug. RT 331. The prosecutor then asked Ms. Ali if, in light of this fact, she thought that she could "carry on as a juror." *Id.* Ms. Ali responded, "I really don't know."

On this point, Petitioner further contends, "When a prosecutor does not question a juror on a factor, but then claims to exercise a challenge because of that factor, that shows the purported ground is pretextual." Traverse at 7. This is true, but it misrepresents the exchange between the prosecutor and Ms. Ali. In fact, the record shows that the prosecutor asked numerous follow-up questions about Ms. Ali's medical condition and the type of interruptions that it might create. *See* 2 Aug. RT 331-33. In response, Ms. Ali continued to express reservations about her ability to serve on the jury. The prosecutor's questioning and exercise of a peremptory challenge on the basis of Ms. Ali's medical condition appear race-neutral, and the state courts' findings to that effect were reasonable.

Finally, the Court reviews what Petitioner claims to be the sixth reason the prosecutor exercised a peremptory challenge of Ms. Ali – her age. As previously noted, the record does not support the claim that the prosecutor identified Ms. Ali's age as an independent basis for her peremptory challenge. Nonetheless, the Court considers it in this *Batson* analysis out of an abundance of caution. Ms. Ali was 72 years old. Petitioner argues as pretext the fact that the prosecutor did not challenge Juror 5, who was 64. Am. Pet. at 24 (citing 4 Aug. RT 738-40). However, for many individuals, the difference of

United States District Court
Northern District of California

1    eight years can result in a meaningful difference in cognitive and physical functioning.

2    Without the opportunity to personally assess Ms. Ali's demeanor and interaction with the

3    trial court, and thereby come to an independent determination of how her age might have

4    presented itself in relation to her suitability as a juror, the Court must defer in this respect

5    to the state appellate court, which in turn properly deferred to the trial court for the same

6    reason.  Ultimately, both the record and Petitioner's argument on this point fail to provide

7    clear and convincing evidence that the presumption of reasonableness should be displaced.

8    *See Rice v. Collins*, 546 U.S. 333, 338 (2006) ("State-court factual findings, moreover, are

9    presumed correct; the petitioner has the burden of rebutting the presumption by clear and

10   convincing evidence." (internal quotation marks omitted)).

11          In light of the record as discussed above, the state appellate court's conclusion that

12   race was not a substantially motivating factor in the prosecutor's peremptory challenge of

13   Ms. Ali was not objectively unreasonable such that it was "beyond the possibility for

14   fairminded disagreement."  *See Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

15

16          **2.  Ms. Johnson-Hagler**

17          The prosecutor offered three reasons for challenging Ms. Johnson-Hagler: (1) "She

18   is connected to the criminal justice system, and, again, not on the law enforcement side."

19   (2) "She seemed nice," but she was very "opinionated and very strong-willed and very

20   loud."  The prosecutor noted that Juror 2 was also outspoken and opinionated, but that she

21   liked him because he was "hardworking," and that she feared having two opinionated

22   jurors on the same jury because they might "butt heads."  (3) The prosecutor did not like

23   the way that Ms. Johnson-Hagler described her nephews' scrapes with the law.  "She kept

24   talking about her nephews and how stupid they were," the prosecutor explained.  The

25   prosecutor stated, "I certainly wouldn't call that behavior stupid.  I find it objectionable,

26   offensive, frightening. . . . All this woman kept saying is that it was stupid, and that

27   concerns me.  She might not find the defendant's lifestyle that objectionable."  5 Aug. RT

28   834-36.

18

1        The trial court accepted the prosecutor's statement that she was "opinionated,

2    strong-willed and loud." *Id.* at 859.  It also found credible the prosecutor's concern about

3    having two strong-willed jurors that might conflict.  *Id.* at 859-60.  It noted that her family

4    had "extensive connections" with the criminal justice system, stating, "Two of her

5    nephews were convicted of robbery and drug offenses in addition to more minor offenses,

6    such as driving without a license." *Id.* at 860.  The trial court also accepted the

7    prosecutor's claims that, when Ms. Johnson-Hagler stated that her nephews were "stupid,"

8    she did not say that they were "wrong." *Id.*  It agreed that the prosecutor was entitled to be

9    concerned by Ms. Johnson-Hagler's failure to "express feelings that the conduct was in

10   any way morally reprehensible and legally wrong." *Id.* at 859-61.  Accordingly, the trial

11   court reviewed and validated all of the prosecutor's reasons for exercising a peremptory

12   challenge of Ms. Johnson-Hagler.

13       After summarizing the trial court's decision, the California Court of Appeal rejected

14   Petitioner's argument that Ms. Johnson-Hagler was improperly challenged by the

15   prosecutor, writing:

16           Again, negative criminal justice experiences are a valid reason
             to exclude a prospective juror.  (See *Lenix, supra*, 44 Cal.4th at
17           p. 628.)  The strength of Ms. J.'s opinions and their possible
             effect on other jurors could also form a valid concern for a
18           prosecutor during the jury selection process.  (*Id.* at pp. 623-
             614 [race-neutral reason may be based on mix of jurors].)  The
19           trial court's assessment of Ms. J.'s attitude and of the sincerity
             of the prosecution's reasons for excluding her are both entitled
20           to deference on appeal.  (See, e.g., *Mills, supra*, 48 Cal.4th at
             pp. 175, 184-185; *Lenix, supra*, 44 Cal.4th at pp. 613-614,
21           626.)  Substantial evidence supports the trial court's denial of
             Cannon's motion challenging the exclusion of Ms. J.  (See,
22           e.g., *Mills, supra*, 48 Cal.4th at p. 185.)

23   Ex. 7 to Answer at 15-16.

24       Regarding Ms. Johnson-Hagler's connections with the criminal justice system,

25   Petitioner argues that the prosecutor overstated those contacts because one nephew only

26   had an old drug conviction and the other had a minor driving conviction.  Am. Pet. at 28-

27   29.  Petitioner also claims that the trial court exaggerated the record because "[o]nly one

28   nephew was convicted of a criminal offense, and the crime was drug-related, not robbery."

United States District Court
Northern District of California

19

1    *Id.* at 31-32.  Petitioner additionally claims that the trial court ignored the fact that several

2    non-black jurors' families and friends had equivalent criminal histories.  *Id.* at 32.

3            However, the Court agrees with the State that Petitioner misstates the record

4    concerning the nephew's "old drug conviction."  Answer at 19.  The nephew was actually

5    involved in a drug-related robbery in which an accomplice fired a gun and the nephew

6    served two years in state prison.  2 Aug. RT 311, 316-17.  Ms. Johnson-Hagler even

7    characterized the crime as "more of a robbery."  *Id.* at 316.  Similarly, the other nephew

8    was not arrested for merely driving without a license, but for driving without a license in

9    violation of probation, and for trying to evade the officer who made the traffic stop.  *Id.* at

10   312, 318-19.  The fact that the nephew was not convicted at the time of jury selection –

11   although he was still in custody and faced potential charges – is less important than the fact

12   that his probationary status suggests some other additional criminal history.  *Id.*

13           As with Ms. Ali, the Court must conduct a comparative juror analysis here where

14   the state courts did not.  In doing so, the Court finds that Ms. Johnson-Hagler's

15   connections to the criminal justice system are distinguishable from those of the seated

16   jurors.  Ms. Johnson-Hagler's connections are decidedly more serious than those of Juror

17   1, who had a friend that received a DUI, but which was contested and cleared, and a

18   brother who had also been arrested for a DUI that was still pending at the time of trial.  *See*

19   4 Aug. RT 609-10.  Juror 1 felt that his brother and friend had been treated fairly by the

20   justice system, perhaps even "too fairly."  1 Aug. RT 206.

21           Ms. Johnson-Hagler's connections are similarly more serious than those of Juror 5,

22   whose son was convicted of possession of methamphetamine ten years earlier, served time

23   in a county jail, and turned his life around – a process the Juror described as positive for

24   his son.  *See* 4 Aug. RT 739-40.  Unlike Ms. Johnson-Hagler's nephew that served time in

25   a state prison for robbery, Juror 5's son only served time in a county jail and was involved

26   in a victimless crime.  Further, Juror 5's experience with his son's criminal behavior was

27   an admittedly positive one, which would reasonably make this connection to the criminal

28   justice system less distasteful for a prosecutor.

United States District Court
Northern District of California

20

1    A comparison between Ms. Johnson-Hagler and the remaining jurors identified by

2    Petitioner is even less helpful, especially given the more tenuous familial connections that

3    those jurors had with the lawbreakers.  Juror 10 had a *college friend* that was arrested for

4    drug possession and counterfeiting twelve years earlier.  *Id.* at 700-05.  He believed his

5    friend had been treated fairly.  *Id.*  Juror 11 had a *marriage-related* nephew that had been

6    recently arrested for a DUI that resulted in the death of a passenger, but had not yet been

7    charged with any crime.  3 Aug. RT 413-16.  Like most of the others, Juror 11 stated that

8    her nephew had been treated fairly by the system.

9         All of the preceding comparisons are weak.  The isolated incidences of criminality,

10   largely committed by the jurors' friends, roommates, and non-blood relatives, with only a

11   few exceptions, are not comparable to the repeat criminality of Ms. Johnson-Hagler's

12   nephews.  Further, these comparisons must be viewed in context.  *See Cook*, 593 F.3d at

13   822 (finding detracting characteristics of a challenged juror made him not "otherwise-

14   similar" to seated jurors that shared certain other similarities).  For example, none of these

15   Jurors expressed the kind of dismissive attitude displayed by Ms. Johnson-Hagler's

16   flippant description of these crimes as "stupid."  Accordingly, the Court finds that the

17   appellate court was reasonable in affirming the trial court's assessment of the prosecutor's

18   explanation that she dismissed Ms. Johnson-Hagler in part because of her connections to

19   the criminal justice system.

20        Petitioner next takes exception with the prosecutor's challenge of Ms. Johnson-

21   Hagler for being opinionated, while she passed on opinionated Juror 2.  Am. Pet. at 29.

22   Petitioner argues that a challenge on this basis was pretextual because white seated Juror 2

23   was also opinionated.  *Id.*  However, the prosecutor explained that her reason for

24   challenging Ms. Johnson-Hagler was not just because she was opinionated (in fact, Ms.

25   Johnson-Hagler self-described as "very opinionated, 2 Aug. RT 324), but that she did not

26   want *two* opinionated jurors that might butt heads.  5 Aug. RT 834-35. According to the

27   prosecutor, she passed on Juror 2, and not Ms. Johnson-Hagler, because Juror 2 was

28   disapproving of his brother's drug conviction, while the prosecutor (and the trial court)

United States District Court
Northern District of California

1   perceived that Ms. Johnson-Hagler was dismissive of her nephews' crimes.  *Id.* at 836.

2   The prosecutor explained, "[T]he attitude I'm looking for in jurors . . . [is that a crime is]

3   despicable conduct, and [an indication that the juror] didn't approve of it."  *Id.*  Moreover,

4   the prosecutor did challenge a white juror that she also considered to be outspoken and

5   strong-willed, supporting the prosecutor's credibility and suggesting the absence of

6   pretext.  *Id.*; *see Jamerson v. Runnels*, 713 F.3d 1218, 1231 (9th Cir. 2013) (explaining that

7   by exercising peremptory strikes against non-black jurors who had similar characteristics

8   to the struck black juror, the prosecutor demonstrated a sincere concern from the same

9   problematic trait she identified in the struck black juror).

10         Finally, Petitioner contests what appears to be the primary reason that the

11   prosecutor exercised the peremptory challenge against Ms. Johnson-Hagler, which was

12   because of her allegedly dismissive attitude toward her nephews' criminal behavior.  Am.

13   Pet. at 30.  The prosecutor explained that she wanted jurors who viewed criminal behavior

14   as offensive and not merely a poor choice.  5 Aug. RT 835.  The trial court agreed,

15   similarly finding that Ms. Johnson-Hagler's attitude was dismissive – a judgment of

16   demeanor that this Court is not in the position to second-guess absent compelling evidence.

17   Nonetheless, Petitioner contends that a comparison with Jurors 5 and 11 on this point

18   demonstrates pretext.  Am. Pet. at 30-31.  However, Juror 5 clearly thought that his son's

19   criminal behavior was offensive and morally reprehensible, the product of being mixed up

20   in the wrong crowd.  4 Aug. RT 741-44.  In fact, he said that his son's arrest was a good

21   experience for him.  *Id.*  Juror 11 did not say anything to suggest that she did not find her

22   out-of-state, marriage-related nephew's recent DUI to be morally objectionable.  Instead,

23   she explained that she did not know much about the incident.  3 Aug. RT 412-13.  This is

24   in contrast to Ms. Johnson-Hagler's description of her nephew's behavior as "stupid,"

25   which both the prosecutor and the trial court found to be dismissive.  2 Aug. RT 312, 316-

26   17, 322.

27

28

1    In light of the record as discussed above, the state court's conclusion that valid

2    grounds, and not race, motivated the strike of Ms. Johnson-Hagler was not objectively

3    unreasonable.

4

5        **3. Ms. Norman**

6        The prosecutor provided three reasons for challenging Ms. Norman: (1) She had a

7    "strong connection" to the criminal justice system, in the form of a brother that was

8    incarcerated for much of his life.  When asked whether she thought her brother had been

9    treated fairly, she answered, "For the most part, I guess so."  (2) She had a negative

10   experience with the criminal justice system regarding an incident of identity theft.  (3) She

11   exhibited a bad attitude in court, and provided an odd answer to the prosecutor's question

12   regarding her ability to be fair as a juror.  5 Aug. RT 839-42.

13       The trial court validated these reasons, finding that she had a "strong connection

14   with the criminal justice system," and that "[r]elatives of hers . . . had been arrested and

15   convicted of drug offenses for burglary."  5 Aug. RT 862-64.  The trial court also validated

16   the prosecutor's concern about Ms. Norman's bad experience with the criminal justice

17   system, and corroborated the prosecutor's claim that Ms. Norman exhibited a bad attitude,

18   stating: "[The prosecutor] doesn't want someone who felt that she was badly treated sitting

19   on a jury, and who might transfer those feelings to this particular case.  I think it's fair to

20   say that Ms. Norman, the prospective juror, exhibited a hostile attitude toward the

21   prosecutor."  *Id.*

22       The state appellate court determined that the trial court's findings were race-neutral

23   and supported by substantial evidence, writing:

24           Ms. N.'s personal and strong negative experience of the
             criminal justice system–being falsely arrested because of the
25           acts of a third party who stole her identity–forms a proper race-
             neutral reason for a prosecutor to exercise a peremptory
26           challenge against her. (See *Lenix, supra*, 44 Cal.4th at p. 628.)
             The trial court found that Ms. N. displayed an attitude hostile
27           to the prosecution, another race-neutral reason for exclusion.
             On appeal, a trial court's assessment of a prospective juror's
28           nonverbal attitude is entitled to deference on appeal.  (*Mills,*

United States District Court
Northern District of California

*supra*, 48 Cal.4th at p. 176; *Lenix*, *supra*, 44 Cal.4th at pp. 613, 622.)  Its finding that the prosecutor's reasons for excluding her from the jury were credible is also entitled to deference on appeal.  (See, e.g., *Mills*, *supra*, 48 Cal.4th at pp. 175, 184-195; *Lenix*, *supra*, 44 Cal.4th at pp. 613-614, 626.)  As substantial evidence supports the trial court's findings, it properly denied Cannon's *Batson-Wheeler* motion as to Ms. N.  (See, e.g., *Mills*, *supra*, 48 Cal.4th at p. 185).

Ex. 7 to Answer at 16-17.

The appellate court's findings regarding the challenge of Ms. Norman were reasonable.  First, Petitioner objects to the prosecutor's claim that Ms. Norman "had a strong connection" with the criminal justice system.  Am. Pet. at 35.  Petitioner argues that seated white Jurors 2, 5, 10, and 11 had similarly strong criminal connections and yet were seated, which Petitioner claims is evidence of pretext.  *Id.*  The Court disagrees.  Ms. Norman stated, "My brother . . . has been in and out of every California jail there is."  3 Aug. RT 444.  He had been in at least two state prisons.  *Id.* at 446.  Additionally, he was currently in a mental hospital because of his drug use.  *Id.* at 444, 447, 452.  Further, Ms. Norman stated that she was close to her brother, which might lead to the reasonable conclusion that she was more affected by her brother's exposure to the criminal justice system than the other jurors.  *See* 5 Aug. RT 863.  Conversely, Jurors 2, 5, 10, and 11 did not have close relatives that were career criminals with the long history of incarceration experienced by Ms. Norman's brother.  These jurors have been profiled in the comparative juror analyses undertaken above, and provide weak comparisons to Ms. Norman, foreclosing Petitioner's claim of pretext.  *See Cook*, 593 F.3d at 817 (explaining that the differences in seated jurors' relatives' criminal experiences and struck juror's experience meant that the jurors were not similarly situated and prosecutor's justification was not pretextual).

Second, Petitioner objects to the prosecutor's claim that she was concerned that Ms. Norman had a bad experience with the criminal justice system regarding an incident of identity theft, and that this would make it difficult for her to serve as an impartial juror.  Am. Pet. at 35-36.  Ms. Norman had been the victim of identity theft that resulted in an erroneous warrant for her arrest.  When she tried to have her record expunged, a judge

United States District Court
Northern District of California

1   refused.  This process, she told the court, made her feel "more like a victim by the courts at

2   the time."  3 Aug. RT 444.  She also stated, "I kept feeling if I'm innocent, what does

3   guilty people feel like."  *Id.* at 448.  She explained that she "didn't like the way it was

4   handled," that she was never able to clear her name, and that the experience still bothered

5   her.  *Id.* at 448, 452-53.  The prosecutor's concern about Ms. Norman's negative

6   experience and apparent increased sympathy for guilty people is valid and race-neutral.

7   Petitioner's argument that all victims of identity theft have a bad experience is

8   unpersuasive.  The prosecutor's discomfort with Ms. Norman, as the trial court validated

9   on the record, was that the "juror was offended and still was offended by the way she

10  personally was treated by the Court."  5 Aug. RT 862.  Because none of the other jurors

11  that were victims of identity theft articulated a problem with the justice system's response

12  to their victimization, the Court rejects Petitioner's comparative juror analysis, finding no

13  evidence of pretext.  *See* Am. Pet. at 37.

14          On this point, Petitioner also objects to what he describes as "disparate questioning"

15  between Ms. Norman and Jurors 3 and 6.  Am. Pet. at 37.  Petitioner points out that all

16  three of these individuals were victims of identity theft, but that only Ms. Norman was

17  questioned about it.  Citing *Miller-El v. Dretke*, 545 U.S. 231, 255-63 (2005), Petitioner

18  argues that this demonstrates pretext.  However, Petitioner misrepresents the record.  In

19  fact, it was the trial court, and not the prosecutor, that initially asked Ms. Norman

20  additional questions about her experience with identity theft.  3 Aug. RT 443-44.  It was

21  only after Ms. Norman provided disturbing responses to the court's questions that the

22  prosecutor pursued further questions on that topic.  *See id.* at 444-49.  This is not the kind

23  of "disparate questioning" that was addressed by the Supreme Court in *Miller-El*, and the

24  Court finds no evidence of pretext.

25          Finally, Petitioner contests the prosecutor's claim that she was concerned about Ms.

26  Norman's bad attitude and the way that she responded when asked if she could be a fair

27  juror.  Am. Pet. at 36-39.  Petitioner argues that the trial court said that Ms. Norman

28  "'exhibited a hostile attitude toward the prosecutor,'" but that "the prosecutor made no

United States District Court
Northern District of California

United States District Court
Northern District of California

1  such claim."  Am. Pet. at 38.  While it is true that the prosecutor noted Ms. Norman's

2  negative attitude toward everyone in the court, it appears from the record that the trial

3  court found her attitude toward the prosecutor to be especially disconcerting.  *See* 5 Aug.

4  RT 839 (prosecutor: "I didn't think that Ms. Norman had the best attitude."); *id.* at 840

5  (prosecutor: "I don't think she treated me any differently than she treated Mr. Johnson, but

6  she just had a general, just not the best attitude about being here.").  The trial court's

7  finding that Ms. Norman was hostile to the prosecutor reflected the prosecutor's reasoning,

8  as the prosecutor included Ms. Norman among those jurors who had a hostile attitude

9  toward her specifically.  *Id.* at 842 ("If a juror doesn't like me, they're going to have a

10  tendency to not listen to a thing that I have to say.  And so I am taking that into account .

11  . . .").  Moreover, the prosecutor and the trial court noted that other non-black

12  venirepersons were challenged because of their hostile attitudes.  5 Aug. RT 840-41, 843.

13  This fact supports a finding that the prosecutor's actions were not pretextual.  *See Ngo v.*

14  *Giurbino*, 651 F.3d 1112, 1116-17 (9th Cir. 2011) (finding support for determination that

15  the prosecutor's justifications were not pretextual where prosecutor also struck other

16  prospective jurors who presented similar characteristics).

17          Moreover, the Court agrees that it was odd for Ms. Norman to respond to the

18  question of whether she could be a fair juror by pointing out the prosecution's burden in

19  the case.  The Government does not contend that this was an incorrect statement of law,

20  only that it seemed peculiar and evasive.  This response further demonstrated Ms.

21  Norman's hostility toward the prosecution, and deflected the conversation away from her

22  role as a potential juror and toward the prosecution's role in proving the case.  *See* 3 Aug.

23  RT 448-49.

24          For the foregoing reasons, the Court finds that the state appellate court's

25  determination that the prosecutor's exercise of a peremptory challenge against Ms.

26  Norman was not discriminatory in nature was not objectively unreasonable.

27

28

1

United States District Court
Northern District of California

### 4. Ms. Donnelly

The prosecutor offered three reasons for challenging Ms. Donnelly: (1) She had a bad attitude, answering questions in a blasé tone and failing to show any concern that she made everyone wait when she returned late to court after a break while she was in the jury box.  (2) She had many friends and cousins who had been arrested and charged with drug crimes.  (3) She had been on disability for two years.  5 Aug. RT 830-33.  The trial court validated the first two of these reasons, but did not address the third.  *Id.* at 854-58.

The prosecutor additionally argued that she could not have had a policy of excluding black women because she passed on the jury twice while Ms. Donnelly was seated.  *Id.* at 830.  While the trial court found that this was a "factor the trial court may consider as indicating that the prosecutor's reasons are not a sham," 5 Aug. RT 857, this Court does not find this argument especially convincing.  In the Court's experience, attorneys often intentionally pass on a jury with objectionable venirepersons as part of a larger jury-selection strategy.  However, while the Court does not agree that passing on Ms. Donnelly provides useful evidence of race-neutral motivations, it finds that the prosecutor's decision to do so certainly does not *suggest* racial bias, and that the state courts' validation of this argument was not objectively unreasonable.

The state appellate court determined that the trial court's findings were race-neutral and supported by substantial evidence.  That court wrote:

> A trial court's assessment of a prospective juror's attitude may be based on in-court observations that do not appear in the record on appeal.  (*Lenix*, *supra*, 44 Cal.4th at p. 622.)  While the prosecutor initially concluded that Ms. D. would be an acceptable juror, her later-displayed blasé attitude changed that assessment as voir dire continued.  (See *id.* at p. 623 [fluidity of jury selection process].)  An evaluation of nonverbal cues is entitled to deference on appeal, as is the trial court's finding that the prosecution's reasons for excluding Ms. D. were race-neutral.  (*Mills*, *supra*, 48 Cal.4th at pp. 175-176, 184-185; *Lenix*, *supra*, 44 Cal.4th at pp. 613-614, 622, 626.)  Substantial evidence supports the trial court's findings.  Thus, the trial court properly denied Cannon's motion challenging the exclusion of Ms. D.  (See, e.g., *Mills*, *supra*, 48 Cal.4th at p. 185).

Ex. 7 to Answer at 17-18.

United States District Court
Northern District of California

1    This Court finds that the appellate court's findings regarding the challenge of Ms.

2    Donnelly were reasonable.  First, Petitioner objects to the prosecutor's claim that she

3    challenged Ms. Donnelly because of her bad attitude.  Am. Pet. at 41.  Petitioner contends

4    that the prosecutor's explanation is pretextual because she described Ms. Donnelly's

5    demeanor as both "nonplussed" and "blasé," two words that are "totally opposite," making

6    the prosecutor's claim "necessarily wrong, because the juror could not have behaved in

7    two opposite ways at the same time." *Id.*  The Court disagrees that the two terms are total

8    opposites in common usage.  However, even if they were, the prosecutor's explanation

9    leaves little room for confusion when viewed in the context of the transcript.  Both the

10   prosecutor and the trial court were disturbed by Ms. Donnelly's disregard for the judicial

11   proceedings as demonstrated when she arrived late to Court without apology.  The Court

12   must address the merits of that concern, and not the prosecutor's word choice in

13   articulating it.

14   The substance of Petitioner's argument is that other jurors came to court late and

15   did not apologize, without being similarly challenged.  *Id.* (citing 5 Aug. RT 855).

16   However, Petitioner's citation is to the court's validation of the prosecutor's concern that

17   Ms. Donnelly was late and had a bad attitude; it does not support Petitioner's argument

18   that other tardy venirepersons *did not apologize*.  Regardless, the trial court here references

19   other tardy venirepersons to distinguish between their lateness and Ms. Donnelly's, who,

20   unlike other late venirepersons, was in the jury box when she was late and not merely in

21   the audience.  5 Aug. RT 855.  Consequently, her tardiness was especially inconvenient for

22   the court.  As a result, the trial court stated that it "observed that which [the prosecutor]

23   observed and stated here, and [the court] was offended by it, as was [the prosecutor]."  *Id.*

24   The trial court was in the best position to observe Ms. Donnelly's demeanor and attitude,

25   and it affirmed the prosecutor's concerns.  *See Snyder*, 552 U.S. at 477 ("[R]ace-neutral

26   reasons for peremptory challenges often invoke a juror's demeanor . . . making the trial

27   court's firsthand observations of even greater importance"); *Briggs v. Grounds*, 682 F.3d

28   1165, 1178 (9th Cir. 2012) (prosecutor's reason that challenged juror was not taking

1    process seriously and would not be a good juror was not pretextual).  Consequently, this

2    Court finds no reason to supplant the trial court's determination.

3          Regarding the prosecutor's second explanation, Petitioner argues that the prosecutor

4    should have asked follow-up questions regarding Ms. Donnelly's connections to the

5    criminal justice system.  Am. Pet. at 41-42.  The record is clear, however, that the

6    prosecutor did ask follow-up questions.  *See* 1 Aug. RT 136-37.  Moreover, the

7    prosecutor's primary concern here was not the specificity of Ms. Donnelly's answers, but

8    the fact that she did not appear to sufficiently disapprove of the criminal lifestyle.  *See* 5

9    Aug. RT 831 (prosecutor explaining that her main focus was selecting "jurors who are not

10   okay with crime").  Ms. Donnelly had numerous relatives that had been convicted of drug-

11   related offenses, and, according to the prosecutor, seemed dismissive of their criminal

12   behavior.  The trial court agreed with this observation, stating that Ms. Donnelly "appeared

13   to feel that a life of crime was not objectionable."  5 Aug. RT 856.  As with the

14   prosecutor's first purported reason for challenging Ms. Donnelly, this Court must defer to

15   the trial court's assessment of the challenged venireperson's verbal and nonverbal conduct,

16   absent a compelling reason to do otherwise.

17         Finally, Petitioner objects to the prosecutor's third reason for challenging Ms.

18   Donnelly, which was because she was on disability.  Am. Pet. at 42.  The prosecutor

19   stated: "My other concern is that she's on disability.  She's been on disability for a couple

20   of years.  She's 58 years old.  She's not retired yet.  She's on disability."  5 Aug. RT 832;

21   *see* 1 Aug. RT 113, 136.  The prosecutor did not explain why this concerned her, and the

22   trial court did not address, on the record, the validity of this explanation.  Petitioner notes

23   that discriminating against the disabled in jury service is a violation of federal law.  Am.

24   Pet. at 42 (citing *Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.3d 1103 (9th Cir.

25   1985)).  Petitioner also correctly points out that Ms. Donnelly said that she doubted her

26   condition would interfere with her ability to be a juror.  1 Aug. RT 114.

27         However, the prosecutor explained that she would not have challenged Ms.

28   Donnelly solely on the basis of her disability.  5 Aug. RT 832.  In fact, the prosecutor

United States District Court
Northern District of California

29

explained that, despite her disability, Ms. Donnelly was "suitable" up until the point that she was late to court and exhibited a bad attitude. *Id.* According to the prosecutor, it was the bad attitude, and not her disability, that made Ms. Donnelly a disagreeable juror and resulted in the prosecutor's challenge. *Id.* Because that explanation is reasonable and was the prosecutor's expressed substantial motivation for the challenge, the Court finds no support for the contention that race was a substantially motivating factor in the exercise of the prosecutor's challenge. Further, Petitioner's comparison between Ms. Donnelly and the also disabled Juror 11 is unhelpful, as the two are distinguishable both in terms of their disabilities – and therefore the potential that the disabilities will interfere with jury service – and most importantly for this challenge, their demeanor in court. *See* 5 Aug. RT 845; *Cook*, 593 F.3d at 822 (other detracting characteristics can set challenged venirepersons apart from seated jurors, despite various similarities).

For the foregoing reasons, the Court finds that the state appellate court's determination that the prosecutor's exercise of a peremptory challenge against Ms. Donnelly was not discriminatory in nature was not objectively unreasonable.

### 5.  Ms. Harris

The prosecutor gave four reasons for challenging Ms. Harris: (1) She used poor judgment in slapping someone who assaulted her.  (2) She did not initially acknowledge that she knew people who were arrested until the prosecutor revisited that question.  (3) Her boyfriend was carjacked by friends and she was sympathetic to his desire to retaliate – which was similar to the prosecution's case theory.  (4) She was 24 or 25 years old and seemed young.  5 Aug RT 836-39.  The trial court validated each of these reasons. *Id.* at 861-62.

The state appellate court determined that the trial court's findings were race-neutral and supported by substantial evidence.  That court wrote:

> The striking similarities between the circumstances of Ms. H.'s boyfriend's carjacking and the prosecution theory about why Cannon killed Galloway provide a sufficient nexus to this case

United States District Court
Northern District of California

1    to support the trial court's finding that the cited reason was
     race-neutral. (See *U.S. v. Bishop* (9th Cir. 1992) 959 F.3d 820,
2    825.) In addition, Ms. H.'s relative youth and lack of life
     experience also form a race-neutral reason for exclusion. The
3    trial court found these reasons to be credible and we must defer
     to that finding on appeal. (See, e.g., *Mills*, *supra*, 48 Cal.4th at
4    pp. 175, 184-185; *Lenix*, *supra*, 44 Cal.4th at pp. 613-614,
     626.) Substantial evidence supports the trial court's denial of
5    the Batson-Wheeler motion as to Ms. H., as well. (See, e.g.,
     *Mills*, *supra*, 48 Cal.4th at p. 185).

6    Ex. 7 to Answer at 19-20. This Court finds that the state appellate court's findings were

7    reasonable.

8         Petitioner first objects to the prosecutor's claim that she was concerned by Ms.

9    Harris's poor judgment in slapping someone who assaulted her. Am. Pet. at 33-34.

10   Petitioner argues that the prosecutor misrepresented the account of this assault when she

11   stated that Ms. Harris could have walked away instead of slapping the assailant. *Id.* at 47.

12   Instead, Petitioner claims, Ms. Harris explained that she was trying to walk away when she

13   slapped the assailant. *Id.* However, Petitioner is incorrect; Ms. Harris testified that she

14   walked away with her friends *after* she slapped him. 4 Aug. RT 693-94. Regardless, the

15   prosecutor's concern was that slapping the assailant demonstrated poor judgment because

16   the situation could have escalated as a result. 5 Aug. RT 837. This concern was not

17   unreasonable, as the assailant in fact continued to follow and harass her after she slapped

18   him. *See* 4 Aug. RT 693-94. The trial court agreed, stating, "If the juror has that bad

19   judgment in terms of their own personal conduct and safety, it's reasonable to assume that

20   they're going to exercise bad judgment in terms of evaluating evidence in this case." 5

21   Aug. RT 861. This assessment is not objectively unreasonable or beyond the possibility of

22   "fairminded disagreement." *See Harrington*, 131 S. Ct. at 786-87.

23        Petitioner next objects to the prosecutor's second reason for challenging Ms.

24   Harris, which was that she did not initially disclose her connection to people that had been

25   arrested. Am. Pet. at 47-48. Here, Petitioner argues that Ms. Harris failed to identify

26   connections to the criminal justice system because she was not asked to do so by the trial

27   court. *Id.* But Petitioner is again incorrect. The jurors were given a list of 14 written

28   questions to which they provided verbal responses. Question 12 asked, "Have you or any

1  member of your family or any of your relatives or any close friends ever been arrested for,

2  cited for, or charged with any type of criminal offense?"  1 Aug. RT 58.  Ms. Harris

3  answered, "I've been cited.  I have had plenty of speeding tickets, but never been to court.

4  I just paid them."  4 Aug. RT 686.  However, when she was later asked the same question

5  by the prosecutor, she identified "a ton of" boy cousins that had been in trouble with the

6  law, including various arrests and DUIs.  *Id.* at 689.  The prosecutor's concern about this

7  lack of candor is a race neutral justification for the exercise of a challenge.[4]  *See Cook*, 593

8  F.3d at 823.

9         Ms. Harris's evasive answer to this question formed part of the prosecutor's

10  concern about her connections to the criminal justice system.  5 Aug. RT 837.  However,

11  the prosecutor stated that "those connections to the criminal justice system didn't rise to

12  the level of warranting me, as a prosecutor, in my opinion, what my general practice is to

13  excuse her."  *Id.*  Because Ms. Harris's connections to the criminal justice system were not

14  a reason for the challenge, the Court does not need to address Petitioner's comparison

15  between Ms. Harris and the seated jurors who had connections to the criminal justice

16  system.  *See* Am. Pet. at 48.

17        Third, Petitioner objects to the prosecutor's explanation that she challenged Ms.

18  Harris because of the similarity between her ex-boyfriend's desire to retaliate after his car

19  was stolen (a desire that Ms. Harris appeared to sympathize with) and the prosecution's

20  case theory.  Am. Pet. at 48-49, 50.  Ms. Harris described her ex-boyfriend's response as a

21  "pride issue."  4 Aug. RT 688.  She also said he recognized his assailants from the

22  neighborhood.  *Id.* at 687.  The prosecutor was worried that the carjacking was too similar

23  to the prosecution's theory of the crime, specifically that Petitioner killed the victim in

24  retaliation for stealing his car stereo.  5 Aug. RT 838.  The trial court shared this concern,

25

26  ───────────────

[4] The prosecutor also condemned Ms. Harris's initial failure to mention her boyfriend's
27  carjacking experience.  5 Aug. RT 838.  However, Petitioner is correct that Ms. Harris did
tell the judge, "I have had relatives or close friends that have been the victim of a crime."
28  Traverse at 38 (citing 4 Aug. RT 686).  The judge did not ask any follow-up questions on
this point, and the Court does not find this to be evasive.

United States District Court
Northern District of California

explaining that Ms. Harris's understanding for her ex-boyfriend's desire to retaliate might translate into sympathy for Petitioner. *Id.* at 862. This determination is not objectively unreasonable. Additionally, a comparison to seated Jurors 1, 6, and 7 - all crime victims - is unhelpful. *See* Am. Pet. at 48. It was Ms. Harris's apparent sympathy for her boyfriend, a crime victim that wanted to retaliate, that made the prosecutor uncomfortable. Jurors 1, 6, and 7 were *personally* victimized, and *did not* express any desire to retaliate.

Finally, Petitioner objects to the prosecutor's last reason for striking Ms. Harris: because she was young and inexperienced. Am. Pet. at 50. Petitioner argues that the prosecutor's issue with Ms. Harris's age was pretextual because she was 26 while seated Juror 7 was 29. Am. Pet. at 50. The Court shares Petitioner's initial skepticism about this final explanation. However, the record shows that Ms. Harris's age was not the substantial reason for the prosecutor's challenge. *See* 5 Aug. RT 839. Further, the trial court noted that the prosecutor had excused other jurors who were not members of the cognizable class because of their youth. *Id.* at 862. This fact supports the prosecutor's argument that her issue with Ms. Harris's age was not pretextual. *See Briggs v. Grounds*, 682 F.3d at 1176 (prosecutor's challenge to non-African American jurors for same reason as challenged juror lends further support for grounds that strike was not pretextual). Additionally, concerns about youth and a lack of life experience are race-neutral reasons for striking a venireperson. *Sims v. Brown*, 425 F.3d 560, 574-76 (9th Cir. 2005), *amended on other grounds*, 420 F.3d 1220 (9th Cir. 2005); *Mitleider v. Hall*, 391 F.3d 1039, 1049 (9th Cir. 2004); *United States v. You*, 382 F.3d 958, 968 (9th Cir. 2004).

Nonetheless, Petitioner argues that Ms. Harris had plenty of life experience, so she could not have been inexperienced, as the prosecutor claimed. Am. Pet. at 50-51. The trial court explained that it understood the prosecutor's concern to relate to a lack of life experience *caused only by her age*, not by a literally short list of experiences. 5 Aug. RT 862. This Court does not find the prosecutor or the trial court's explanations to be very satisfying. If this were the only reason given for the challenge of Ms. Harris, or if this appeared to be a substantial reason for the challenge, this Court might be inclined to find

that it was pretextual and worthy of additional scrutiny.  However, the record clearly shows that Ms. Harris's "youth" was only an additional reason that the prosecutor found her to be an undesirable juror, and that any concern about her age was secondary to Ms. Harris's lack of candor and, most importantly, the fact that her ex-boyfriend's carjacking experience too closely mirrored the prosecution's case theory.  Consequently, this Court finds that the state courts' determination that the prosecutor's challenge of Ms. Harris did not constitute a *Batson* violation was not objectively unreasonable.

Finally, the Court must address Petitioner's claim that the prosecutor questioned the black venirepersons whom she challenged "far longer" than she questioned the white venirepersons whom she accepted, which Petitioner describes as differential questioning that constitutes pretext under *Miller-El v. Dretke*.  Am. Pet. at 53.  Petitioner provides no quantitative support for this assertion, as did the petitioner in *Miller-El*, and the Court additionally finds support in the record lacking.  Further, it is reasonable that a prosecutor would ask more follow-up questions of venirepersons that concern her.  The Court finds that this argument fails to provide clear and convincing evidence of pretext, and determines that the appellate court's rejection of this claim was not unreasonable.

### C. Summary of *Batson* Claims

For the foregoing reasons, the Court finds that the state appellate court reasonably determined that the prosecutor did not exercise her peremptory challenges of the above venirepersons in a discriminatory manner.  The Court therefore rejects Petitioner's *Batson* claims and denies habeas relief on these grounds.

## II.   Petitioner's Due Process Challenge Fails.

Petitioner also argues that his constitutional rights were violated through the introduction of the coerced testimony of witness Adrianne Ard, entitling him to habeas relief.  Petitioner presents three interrelated arguments: first, that Ms. Ard's detention was improper and he has standing to challenge it directly; second, that his due process rights

1    were violated by the introduction of her testimony at trial; and third, that his trial attorney

2    rendered ineffective assistance by failing to object to her testimony.  However, as

3    explained below, the California Court of Appeal correctly determined that Petitioner lacks

4    standing to challenge Ms. Ard's detention, and reasonably determined that his due process

5    claim is procedurally defaulted and that he suffered no prejudice from his trial counsel's

6    performance.  The petition for habeas based on these claims therefore fails.

7

8            **A. Petitioner does not have standing to directly challenge Ms. Ard's detention.**

9            Petitioner first asserts that he has standing to challenge the detention of Ms. Ard

10   because she was a witness in the criminal case against him.  Am. Pet. at 65.  A defendant

11   seeking habeas relief may generally only raise claims based on his own rights, and not the

12   rights of a third person.  *See Douglas v. Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003).

13   The only case that Petitioner cites for the contrary proposition, *People v. Bunyard*, 45 Cal.

14   4th 836 (2009), regarded a defendant's ability to challenge a decision *not* to detain a state

15   witness, where the resulting witness's unavailability arguably violated the defendant's

16   right to confront the witnesses against him.  45 Cal. 4th at 848, 851.  Nothing in that case

17   suggests that criminal defendants have standing to challenge a trial court's decision to

18   detain a witness where that witness *did* testify at trial.

19           Here, the California Court of Appeal found that "Cannon has no standing to raise

20   Ard's rights on appeal."  Ex. 7 to Answer at 24.  This determination was correct,

21   precluding Petitioner's habeas relief on this claim.

22

23           **B. Petitioner's due process claim is procedurally defaulted.**

24           Petitioner also argues that, regardless of the propriety of Ms. Ard's detention, his

25   own due process rights were violated by the introduction of her testimony.  The California

26   Court of Appeal found that Petitioner's trial counsel failed to object to Ms. Ard's

27   testimony at trial, precluding him from raising the issue on appeal separately from his

28   claim of ineffective assistance of counsel.  Ex. 7 to Answer at 25.  A state court finding

United States District Court
Northern District of California

35

1    that a claim is procedurally defaulted is an adequate and independent state ground

2    warranting denial of the claim in federal habeas.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801

3    (1991).

4           Petitioner argues that his trial counsel did not need to raise this objection in order to

5    preserve it, because the objection would have been futile.  Am. Pet. at 69-70.  Petitioner

6    relies on *Williams (Michael) v. Taylor*, 529 U.S. 420 (2000), for the proposition that trial

7    counsel need not raise a futile issue in order to preserve it for a habeas petition.  In that

8    case, during *voir dire*, the venirewoman who became the jury foreperson withheld the fact

9    that she had previously been married to a deputy sheriff, but Williams' state habeas

10   counsel never learned of that fact while state post-conviction relief was still available.

11   *Williams*, 529 U.S. at 440, 444.  The Supreme Court held that Williams had not "failed to

12   develop" his claim of juror bias under AEDPA, because the bias could not have been

13   discovered even with reasonable diligence prior to the deadline for him to file his state

14   habeas claim.  *Id.* at 444.

15          Here, by contrast, the only evidence of futility is that the trial court stated, in a

16   separate hearing on Ms. Ard's detention where Petitioner and his attorney were not

17   present, that "The issue [of her detention] is strictly a matter between the court and the

18   witness, Ms. Ard."  Am. Pet. at 70.  Whether or not it would have been futile for Petitioner

19   to object to Ms. Ard's *detention*, the trial court's statement does not show that an objection

20   to her *testimony* would have been futile – there is no reason to think that at that point,

21   where Petitioner's interests were clearly implicated, the court would not have heard

22   argument.  Petitioner has not demonstrated that it would have been futile to raise this

23   argument, and the Court of Appeal was not unreasonable in finding that Petitioner's claim

24   was procedurally defaulted.

25          As a result, Petitioner's independent due process claim fails.  However, like the

26   California Court of Appeal, this Court will review Petitioner's claim in the context of his

27   claim for ineffective assistance of counsel.

28

United States District Court
Northern District of California

36

### C. Petitioner's ineffective assistance of counsel claim regarding Ms. Ard's testimony fails.

Petitioner's final challenge regarding Ms. Ard is that his trial counsel rendered ineffective assistance by failing to object to her trial testimony.  To succeed on a claim of ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  In federal habeas, the district court does not review the trial counsel's performance directly; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).  A federal court sitting in habeas must therefore use "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)).

Here, the California Court of Appeal rejected Petitioner's claim that his trial counsel rendered ineffective assistance by failing to object to Ard's trial testimony.  Ex. 7 to Answer at 27 ("As he cannot show prejudice resulting from his defense counsel's failure to object, Cannon cannot establish ineffective assistance of counsel.").  The Court of Appeal found that Petitioner could not establish prejudice from trial counsel's failure to raise a due process challenge, because Petitioner had not shown that any possible coercion of Ms. Ard had rendered the introduction of her testimony unfair.  *Id.* at 26-27.  The Court of Appeal further found that Petitioner also could not show prejudice from the introduction of Ms. Ard's trial testimony, because the "key evidence against him" was her prior statement to the police.  *Id.*  The Court must determine whether this application of *Strickland* was unreasonable.

At the outset, the state court was correct that if Petitioner could not establish prejudice, then he could not succeed on his claim for ineffective assistance of counsel, regardless of whether his trial counsel's performance was defective.  *Strickland*, 466 U.S.

United States District Court
Northern District of California

1    at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995).  No particular

2    finding on the question of performance was required.

3          Regarding the prejudice inquiry, the Court of Appeal's conclusion that Petitioner

4    failed to establish prejudice was not unreasonable.  The Court of Appeal found that

5    Petitioner could not show prejudice, first, because he could not actually show a due

6    process violation.  The introduction of a witness's coerced testimony violates a defendant's

7    due process rights when it renders the trial fundamentally unfair.  *Williams v. Woodford*,

8    384 F.3d 567, 593 (9th Cir. 2002).  In determining fundamental fairness, a court should

9    consider whether the prosecution told the witness what to say, the amount of time that

10   passed between the alleged impropriety and the witness's testimony, and whether cross-

11   examination presented the jury with sufficient evidence to evaluate the witness's

12   credibility.  *Id.* at 594, 596; *United States v. Mattison*, 437 F.2d 84, 85 (9th Cir. 1970).

13         Here, considering these factors, the Court of Appeal was not unreasonable in

14   concluding that Petitioner could not show prejudice because he could not establish a due

15   process violation.  Petitioner's evidence of coercion is that, after testifying for two days

16   that Petitioner was not the shooter, Ms. Ard changed her story on the third day, after the

17   prosecutor told her during a recess that she could go home once she told the truth.  Am.

18   Pet. at 60.  The fact of this conversation came out on cross-examination, during which Ms.

19   Ard made clear that, by "tell the truth," the prosecutor meant she should identify

20   Petitioner, and that, if she could have gone home by testifying that Petitioner was *not* the

21   shooter, Ms. Ard would have done so.  *Id.* at 60, 66.

22         Although there is no evidence that the prosecutor explicitly told Ms. Ard to identify

23   Petitioner, that is clearly what the prosecutor had in mind when she said to tell the truth.

24   Moreover, the prosecutor said this on the third day of Ms. Ard's testimony, so there was no

25   temporal separation between the alleged coercion and the witness's testimony.  The first

26   two *Williams* factors therefore weigh against the fairness of the testimony.  Nonetheless,

27   the third factor weighs decidedly in favor of its fairness.  The prosecutor's statement came

28   out on cross-examination.  The jury was presented with sufficient evidence to evaluate

                                                  38

1    why Ms. Ard would change her testimony.  The Court of Appeal was not unreasonable in

2    concluding that this prevented Petitioner from establishing prejudice on the due process

3    question.

4         The Court of Appeal's second conclusion, that Petitioner could not show prejudice

5    because Ms. Ard's pretrial testimony was the key evidence against him, also was not

6    unreasonable.  In early October of 2008, Ms. Ard twice identified the shooter in phone

7    calls to the police.  Ex. 7 to Answer at 2.  She also identified him from a photo lineup in a

8    videotaped statement.  *Id.*  Although she recanted her testimony in the interim, she stated at

9    a pretrial hearing in October of 2009 that she saw Petitioner shoot the victim at least eight

10   times with a gray-colored gun.  *Id.* at 3.  At trial, the prosecution introduced the content of

11   the first two identifications through the testimony of Officer Fleming.  3 RT 471, 474.  Her

12   videotaped photo lineup identification was played for the jury, and her identification of

13   Petitioner at a pretrial hearing was read into the record.  Ex. 7 to Answer at 23-24.

14        During her trial testimony, Ms. Ard also admitted that she had changed her story

15   many times, and that she was frightened and did not want to be seen as helping the police.

16   *Id.* at 4.

17        Petitioner argues that the state court made an unreasonable determination of the

18   facts, and so its decision is not entitled to deference.  The Court disagrees.  While the

19   prosecution obviously wanted Ms. Ard to inculpate Petitioner at trial, her trial testimony

20   turned out to be equivocal.  In light of this equivocation, her pretrial identifications could

21   have been given more weight by the jury.  Moreover, the jury was presented with a

22   plausible explanation for her reluctance to identify Petitioner: her fear of retaliation.

23   Considering all of this, it was not unreasonable for the Court of Appeal to find that

24   Petitioner failed to establish prejudice from Ms. Ard's trial testimony.

25        For the reasons stated above, Petitioner has not established that it was unreasonable

26   for the Court of Appeal to conclude that he was not prejudiced by his trial counsel's failure

27   to object to Ms. Ard's testimony.  His claim of ineffective assistance of counsel in that

28   regard therefore fails, as does this portion of his habeas petition.

United States District Court
Northern District of California

**III.  Petitioner's Other Ineffective Assistance of Counsel Claims Fail.**

Separate from his ineffective assistance of counsel claim regarding Ms. Ard's testimony, Petitioner argues that his trial counsel rendered constitutionally ineffective assistance for failing to object to the testimony of three other state witnesses.  As noted above, to succeed on a claim of ineffective assistance of counsel in federal habeas, a defendant must show not just that his trial counsel's performance was objectively unreasonable and that there is a reasonable probability that the result of the proceeding would have been different absent the unreasonable performance, *Strickland*, 466 U.S. at 688, 694, but that the state court's application of *Strickland* was itself objectively unreasonable.  *Harrington*, 131 S. Ct. at 785.  In this case, the California Court of Appeal reasonably applied the correct law, so habeas cannot be granted on these claims.

**A. The California Court of Appeal reasonably rejected the claim against Officer Fleming's testimony.**

Petitioner's first challenge is to the testimony of Officer Fleming.  When asked at trial how confident Ms. Ard's initial identification of Petitioner was, Officer Fleming responded, "I was very confident that she had - - that was the person she saw shoot Germaine Galloway."  3 RT 487.  Petitioner now argues that this testimony was improper, because it was unresponsive, and because it was Officer Fleming's opinion without adequate foundation.  Am. Pet. at 72.  According to Petitioner, his trial counsel's failure to object to this allegedly improper testimony was ineffective assistance.  *Id.*

The Court of Appeal found that it was not unreasonable for Petitioner's trial counsel to decline to raise these objections.  Ex. 7 to Answer at 38-39.  The Court of Appeal reasoned that raising an objection would have "brought [Officer Fleming's] testimony to the jury's attention a second time," and that, because these statements were made at the end of Officer Fleming's direct examination, "defense counsel may have considered it more prudent to move on to cross-examination and to questioning Sergeant Fleming about matters that might have brought more benefit to the defense."  *Id.* at 39.  Petitioner argues

40

1    that this determination was unreasonable, because a defense attorney waiting to deal with

2    objectionable testimony on cross-examination is like a farmer closing the barn door after a

3    horse has been stolen – the action is too little, too late, such that no reasonable defense

4    counsel (or farmer) would act in such a way.  Am. Pet. at 73.

5         The Court of Appeal's determination was not unreasonable.  Once Officer Fleming

6    gave his response, to use Petitioner's metaphor, the horse had already left the barn; raising

7    an objection *after* Officer Fleming's statement could not have prevented him from saying

8    it in the first place.  Indeed, by raising an objection, defense counsel may have flagged the

9    statement for the jury as important.  And, as the Court of Appeal noted, an objection would

10   likely lead to a reiteration of the question and, most likely, the substance of Officer

11   Fleming's testimony.  It was not unreasonable to find that a reasonable defense attorney

12   could have considered it prudent to avoid such repetition.  Moreover, defense counsel

13   returned to Officer Fleming's evaluation of Ms. Ard's statement on cross-examination, and

14   again on re-cross, with the apparent goal of showing that Ms. Ard was not a reliable

15   witness and that Officer Fleming was not qualified to offer an opinion about her veracity.

16   3 RT 524-25, 541-42.

17        Because the Court of Appeal's determination was not unreasonable, this portion of

18   Petitioner's habeas petition must fail.

19

20   **B. The California Court of Appeal reasonably rejected the claim against**

21   **Deputy Swalwell's testimony.**

22        Petitioner's next challenge is to the testimony of Deputy District Attorney

23   Swalwell.  When asked by the prosecutor, "Is it fair to say that Ms. Ard was not truthful

24   when she testified at the preliminary hearing?", Deputy DA Swalwell responded, "Yes."  7

25   RT 1192.  Petitioner argues that this was an improper opinion regarding Ms. Ard's

26   credibility, and that his trial counsel rendered ineffective assistance by failing to object.

27   Am. Pet. at 74.

28

United States District Court
Northern District of California

41

1    The Court of Appeal found that Petitioner had not shown that his trial counsel acted

2    unreasonably.  Ex. 7 to Answer at 40.  The court explained that, at the preliminary hearing,

3    Ms. Ard had first denied even giving her videotaped statement to the police, until it was

4    produced, and that the photograph of Petitioner that she had selected was not actually a

5    picture of him.  *Id.*  The court found that the prosecutor's question, given at the opening of

6    redirect, was "a preliminary question that did little more than tell the jury what they

7    already knew . . . ."  *Id.*

8    The Court of Appeal's determination was not unreasonable.  Given the clear

9    inconsistencies between Ms. Ard's statements at the preliminary hearing and the

10   undisputed videotape and photographic evidence, Petitioner's counsel could have

11   reasonably decided that it was better to rest on his cross-examination, rather than belabor

12   these inconsistencies through an objection at the very beginning of redirect.  Petitioner's

13   ineffective assistance claim regarding Deputy Swalwell therefore fails.

15   **C. The California Court of Appeal reasonably rejected the claims against**

16   **Inspector Juanicot's testimony.**

17   Petitioner also challenges two aspects of the testimony given by Inspector Juanicot.

18   First, Petitioner argues that Inspector Juanicot improperly relayed the opinion of the

19   victim's girlfriend, Falisha Fullard, that Petitioner had been lying when he previously told

20   her that he did not shoot Galloway.  Am. Pet. at 75.  Petitioner argues that his trial

21   counsel's failure to object to this opinion testimony was ineffective assistance of counsel,

22   because there is no reasonable strategic reason to not object to such opinion testimony.  *Id.*

23   The Court of Appeal rejected this claim.  Ex. 7 to Answer at 41-42.  The court noted

24   that immediately prior to these statements, Petitioner's trial counsel had objected to

25   Inspector Juanicot's introduction of Ms. Fullard's statements as hearsay; the trial court

26   overruled the objection.  *Id.* at 41.  The Court of Appeal reasoned that "Fullard's assertive

27   statement that she told Petitioner that she did not believe him was the crux of the

28   inconsistency with her prior testimony," and therefore the reason the testimony was

admissible under the prior inconsistent statement exception to the rule against hearsay.  *Id.*
As a result, Petitioner could not show any prejudice from his trial counsel's failure to
object on the separate ground of giving an inadmissible opinion.  *Id.*

The Court of Appeal also found that Petitioner had not shown deficient performance
for failing to object.  *Id.* at 42.  The court reasoned that objecting to Inspector Juanicot's
testimony again would have distracted the jury from that part of his testimony where he
indicated that Petitioner had protested his innocence to Ms. Fullard.  *Id.*  The court
summarized its conclusion: "With error unlikely and prejudice nonexistent, Cannon cannot
demonstrate ineffective assistance of counsel."  *Id.*

Neither determination by the Court of Appeal was objectively unreasonable.  While
the Court considers it somewhat unlikely that Petitioner's trial counsel deliberately chose
not to object to this testimony on opinion grounds in order to avoid distracting the jury
from a separate piece of testimony, neither can the Court say that the Court of Appeal's
determination was unreasonable.  More importantly, though, the Court of Appeal
reasonably found that there was no prejudice here, because "the trial court acted within its
discretion to admit the evidence."  *Id.* at 41.  Petitioner makes no argument against the
court's finding of no prejudice; instead, he focuses entirely on his claim that there was no
strategic reason not to object.  Am. Pet. at 74-75.  Because neither determination by the
Court of Appeal was unreasonable, this portion of Petitioner's claim fails.

Petitioner also argues that it was ineffective assistance for his trial counsel to fail to
object on hearsay grounds to Inspector Juanicot's statements that some members of the
San Jose State football coaching staff had told him that some players had stayed in Hawaii
after the team's away game there, which tended to undermine Petitioner's alibi that he was
at home having dinner with his brother Yonus Davis, then a member of the San Jose State
football team, when the shooting occurred.  Am. Pet. at 76.

The Court of Appeal found that Petitioner's trial counsel reasonably "chose to
explore the issue on cross-examination–leaving the jury with a final admission that
Inspector Juanicot was unable to undermine the credibility of Davis's alibi for Cannon."

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Ex. 7 to Answer at 43.  Indeed, on re-cross, this is exactly what Petitioner's trial counsel

2    did: rather than excluding the coaching staff's statements altogether, his trial counsel

3    apparently sought to show that those statements were only weak evidence against the alibi.

4    11 RT 1956-59.  Given the doubly deferential standard of review here, the Court cannot

5    say that the Court of Appeal's determination was objectively unreasonable.

6          Because none of the Court of Appeal's determinations regarding Petitioner's claims

7    for ineffective assistance of counsel were unreasonable, each of these claims for habeas

8    relief fails.

9

10   **IV.  Petitioner's Claim of Actual Innocence Fails.**

11         Petitioner additionally claims that he possesses newly discovered evidence that

12   proves his actual innocence.  Am. Pet. at 78-82.  The alleged newly discovered evidence is

13   a December 12, 2011 declaration by Robert Bobino.  Am. Pet. at 78 & Ex. 4.  In this

14   declaration, Bobino states, in part:

15              I saw a man walk up to Galloway's car, on the driver's side.
16         He was wearing a dark colored hoodie.  The man spoke a few
           words to Galloway.  Then he fired approximately five shots.  I
17         saw the gunman's face.  I did not know him.  It was not Dario
           Cannon.  The gunman was relatively tall, approximately 6' tall.
18         He looked Mexican.  After the shooting, everyone, including
           me, ran away in opposite directions. . . .

19              I know Dario Cannon . . . Cannon was not present in the
20         parking lot when Galloway was shot.

21              I never spoke to the police about the incident.  They never
           sought me out or interviewed me.  I did not speak to the
22         defense before trial.  I was arrested and jailed on November 13,
           2008 (six weeks after this homicide).  I was convicted of
23         robbery and sent to Pelican Bay State Prison in Del Norte
           County. . . . No one sought me out there to talk about this case.
24         The first time I ever spoke to anyone on the defense side was
           when I telephoned to Dario Cannon's appeals lawyer, on or
25         about November 10, 2011.

26   Ex. 4 to Am. Pet. (Docket No. 11-1).  Petitioner initially offered this evidence in a habeas

27   petition filed with the California Court of Appeal on December 23, 2011.  Am. Pet. at 78.

28   The appellate court denied the habeas petition without prejudice and authorized Petitioner

1   to file it in Alameda County Superior Court. *Id.* On March 1, 2013, the Superior Court

2   denied the petition on procedural grounds, finding that it was untimely under state law.

3   Ex. 7 to Am. Pet. (Docket No. 11-1).

4          Under California's timeliness rule, a prisoner is required to seek habeas relief

5   without substantial delay, "measured from the time the petitioner or counsel knew, or

6   reasonably should have known, of the information offered in support of the claim and the

7   legal basis for the claim." *In re Robbins*, 18 Cal. 4th 770, 780, 787 (1998). The Superior

8   Court explained that Petitioner failed to show that this information could not have been

9   discovered by diligent investigation even before trial. Ex. 7 to Am. Pet. at 4. Further, the

10   court noted that defense witness Kenneth Maxwell, who was at the scene of the crime,

11   made a reference to "Rob" being at the carport at the time of the shooting. *Id.* at 4-5; 10

12   Aug. RT 1688. Consequently, the existence of this witness should have been known to the

13   defense, and due diligence would likely have resulted in his discovery before trial. As a

14   result, the declaration was not newly discovered evidence that could be considered by the

15   courts. Ex. 7 to Am. Pet. at 4 (citing *In re Hall*, 30 Cal.3d 408, 420 (1981)). The court

16   additionally noted that Petitioner failed to attach a declaration that would have rebutted

17   these facts and supported an allegation of timeliness. *Id.*

18          Petitioner appealed the ruling to the California Supreme Court, including the

19   missing declaration. The declaration, however, merely reiterated the argument for

20   timeliness already made by his appellate counsel to the Superior Court: the defense did not

21   learn about Bobino's presence at the scene until three years after the homicide, and so

22   could not have produced the testimony at trial. *See* Am. Pet. at 79. On November 20,

23   2013, the California Supreme Court denied Petitioner's petition for a writ of habeas corpus

24   in a one-line order. Ex. 9 to Am. Pet. (Docket No. 11-1).

25

26          **A. Petitioner's claim is procedurally defaulted.**

27          Failure to comply with a state procedural rule, such as California's timeliness

28   requirement, renders the claim procedurally defaulted for federal habeas review. *Walker v.*

45

*Martin*, 131 S. Ct. 1120, 1127 (2011).  In cases in which a state prisoner has defaulted his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner: (1) demonstrates cause for the default and actual prejudice as a result of an alleged violation of federal law; or (2) demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Additionally, state-imposed procedural bars such as the one at issue here may be overcome, allowing the claim to be considered by a federal habeas court, if the last state court presented with the claim reaches its merits.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

Petitioner does not dispute the fact that the Superior Court declined to reach the merits of his claim because of California's timeliness rule.  Instead, he contends that the California Supreme Court ultimately reached the merits, and therefore asserts that his claim is not procedurally barred.  Am. Pet. at 79-80.  However, summary denials such as the one issued in this case are not decisions on the merits where the last reasoned state court judgment relies on a procedural bar.  *See Ylst*, 501 U.S. at 802.  In *Ylst*, the Court held that a federal court must "look through" a summary denial to the last-reasoned state decision and "where . . . the last reasoned opinion on the claim explicitly imposed a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Id.* at 803.  This presumption remains post-AEDPA.  *See Harrington*, 131 S. Ct. at 785 (acknowledging validity of *Ylst* presumption post-AEDPA).

Here, the last reasoned state court decision on this issue is the Alameda County Superior Court's decision, which expressly denied Petitioner's claim based on his failure to comply with California's timeliness rule.  Because the state trial habeas court did not rule that Petitioner could cure the procedural default simply by filing a declaration of any substance, it is unlikely that the California Supreme Court silently decided that Petitioner's untimeliness was cured merely because Petitioner's newly filed declaration reiterated the failed arguments for cause previously articulated by his attorney.  As a result, Petitioner is

46

1
2
3
4
5
6

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

unable to overcome the *Ylst* presumption that the California Supreme Court relied on the state timeliness rule in denying his petition.  Consequently, this Court cannot consider Petitioner's newly-discovered evidence claim unless Petitioner: (1) demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) demonstrates that a failure to consider the claim will result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.

Petitioner has failed to show cause for his procedural default.  Defense witness Kenneth Maxwell, who was at the scene of the crime, testified that an individual named "Rob" was at the carport at the time of the shooting.  10 Aug. RT 1688.  In showing cause for the default, it is not enough that Bobino was arrested six weeks after Galloway's murder, as his imprisonment did not make him absolutely inaccessible to Petitioner.  *See Hall v. Biter*, No. 11-2728-JFW (RNB), 2012 WL 2373373, at *11 (C.D. Cal. May 16, 2012) (finding that declarant's ostensible inability to come forward sooner because of his imprisonment was insufficient).

Because Petitioner has not demonstrated cause for the default, the Court now considers whether Petitioner fits within the "narrow class of cases . . . implicating a fundamental miscarriage of justice."  *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).  The miscarriage of justice exception is "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."  *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  "A federal court may invoke [this gateway exception] to justify consideration of claims defaulted in state court under state timeliness rules."  *Id.* at 1932 (2013) (citing *Coleman*, 501 U.S. at 750).  A probabilistic showing of actual innocence is required to have an otherwise procedurally defaulted claim decided on the merits.  *Schlup*, 513 US. at 327.  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Id.*  A mere showing of reasonable doubt is not enough.  *See Wood v. Hall*, 130 F.3d 373, 379

1   (9th Cir. 1997).  Consequently, the gateway is a demanding standard that is "seldom" met.

2   *McQuiggin*, 133 S. Ct. at 1927, 1936.  In *McQuiggin*, for example, the Court held that

3   three affidavits were "hardly adequate" to pass through the *Schlup* gateway where three

4   separate affiants stated: (1) someone other than the petitioner admitted killing the victim,

5   (2) that other man was seen on the night of the murder wearing bloodstained clothing, and

6   (3) a dry cleaning employee accepted the bloodstained clothing from that other man.  *Id.* at

7   1929-30, 1936.

8           Here, Petitioner asserts that Robert Bobino's declaration is newly discovered

9   evidence that satisfies the high standard articulated in *Schlup*.  *See* Traverse at 50.

10  Petitioner is correct that "trustworthy eyewitness accounts" can constitute credible

11  evidence for a gateway claim.  *See Schlup*, 513 U.S. at 324.  In this respect, Bobino's

12  declaration states that Petitioner was not the gunman and that Bobino never spoke to

13  anyone "on the defense side" until November of 2011.  However, Bobino's lone

14  declaration, which the jury might have reasonably discounted, is not nearly as persuasive

15  as the three affidavits in *McQuiggin*, which were *independent and converging*, and yet

16  insufficient to satisfy *Schlup*.  133 S. Ct. at 1929-30, 1936.  Moreover, a court "may

17  consider how the timing of the submission and the likely credibility of the affiants bear on

18  the probable reliability of that evidence."  *Schlup*, 513 U.S. at 332.  Bobino's credibility is

19  questionable, and the timing of his declaration, which surfaced three years after the

20  murder, is suspicious.  Consequently, it is unclear whether the Bobino declaration can be

21  considered a "trustworthy eyewitness account" as envisioned by *Schlup*.

22          Most damaging to Petitioner's claim, however, is the fact that in reviewing a

23  gateway actual innocence claim, the Court "must assess the probative force of the newly

24  presented evidence in connection with the evidence of guilt adduced at trial."  *Id.* at 331–

25  32.  Viewing the Bobino declaration in this context, the Court concludes that Petitioner

26  fails to show that it is more likely than not that no reasonable juror would have convicted

27  Petitioner given the Bobino declaration.  At best, the declaration raises only a modicum of

28  doubt as to the reliability of Ard's identification of Petitioner as the shooter.  Case law

United States District Court
Northern District of California

48

United States District Court
Northern District of California

1    makes clear that this is not enough.  *See Schlup*, 513 U.S. at 329; *see also Wood*, 130 F.3d

2    at 379 (finding that "the mere fact that" undisclosed evidence "could have supported

3    reasonable doubt" was insufficient to overcome the procedural default).  In particular,

4    Petitioner fails to overcome the other substantial evidence of Petitioner's guilt, including:

5    (1) Ard's identification of Petitioner as the gunman in a video-taped interview with

6    Oakland Police, in court a month before trial, and again during trial.  2 Aug. RT 343-44; 7

7    Aug. RT 1203.  A jury chose to believe this testimony, despite Ard's inconsistencies and

8    the fact that she was held in custody as a material witness.  (2) Witness Jackson identified

9    the shooter as a light-skinned African-American male, similar to the description given by

10   Ard, and matching the description of Petitioner.  7 Aug. RT 1199.  (3) Witness Romain

11   placed Petitioner at the scene of the crime within 5-25 minutes of the shooting.  5 Aug. RT

12   798, 803-04.  (4) Petitioner had a motive to kill the victim, who stole an expensive car

13   stereo from him.  7 Aug. RT 1193; 9 Aug. RT 1616.  (5) Petitioner was found in Fresno,

14   California, apparently attempting to evade police because he refused to identify himself

15   and gave a false name when arrested.  7 Aug. RT 1214-20.  Finally, (6) Petitioner's alibi -

16   that he was at his brother's house in San Jose the night of the shooting - was undermined

17   by five recorded jailhouse telephone calls between Petitioner and family members

18   indicating that his brother was in Hawaii on the night of the shooting.  9 Aug. RT 1622-23;

19   11 Aug. RT 1956.  Absent the requisite showing, Petitioner's gateway claim fails and the

20   procedural default of his newly discovered evidence claim cannot be excused under this

21   exception.

22

23           **B. Petitioner's freestanding actual innocence claim is not cognizable.**

24           Even if Petitioner's claim were not procedurally defaulted, a freestanding claim of

25   actual innocence is not cognizable in a non-capital case.  In *Herrera v. Collins*, 506 U.S.

26   390, 400 (1993), the Supreme Court held, "Claims of actual innocence based on newly

27   discovered evidence have never been held to state a ground for federal habeas relief absent

28   an independent constitutional violation occurring in the underlying state criminal

                                                    49

United States District Court
Northern District of California

1  proceeding."  *See also Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("the existence merely

2  of newly discovered evidence relevant to guilt of a state prisoner is not a ground for relief

3  on federal habeas corpus").  The Court in *Herrera* did note that a freestanding actual

4  innocence claim might be cognizable in a capital case, where "a truly persuasive

5  demonstration of 'actual innocence' made after trial would render the execution of a

6  defendant unconstitutional, and warrant federal habeas relief if there were no state avenue

7  open to process such a claim."  506 U.S. at 417.  However, subsequent case law in this

8  Circuit has made clear that actual innocence claims are not cognizable in a non-capital

9  federal habeas case.  *Coley v. Gonzales*, 55 F.3d 1385, 1387 (9th Cir. 1995) ("Coley seems

10  to be making the claim that he is factually innocent - but that claim alone is not reviewable

11  on habeas"); *Garnett v. Neven*, 408 F. App'x 47, 47 n.1 (9th Cir. 2011) ("the Supreme

12  Court has not clearly established whether a freestanding claim of actual innocence exists").

13  Petitioner is correct that a few cases have considered non-capital freestanding actual

14  innocence habeas claims.  Traverse at 50-51 (citing *Spivey v. Rocha*, 194 F.3d 971, 979

15  (9th Cir. 1999); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999)).  However, neither of

16  these cases were governed by AEDPA.  *Spivey*, 194 F.3d at 974 n.3; *Fuller*, 182 F.3d at

17  702.  That fact aside, the Supreme Court has not clearly established that freestanding

18  claims of actual innocence are cognizable.  In *House v. Bell*, 547 U.S. 518, 555 (2006), a

19  capital case, the Supreme Court noted that the question was "left open" in *Herrera*, and

20  declined to reach the issue.  In *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013), the

21  Supreme Court stated, "We have not resolved whether a prisoner may be entitled to habeas

22  relief based on a freestanding claim of actual innocence."  Because the Supreme Court has

23  expressly reserved the issue, it is not clearly established for purposes of 28 U.S.C.

24  § 2254(d).  *See Murdoch v. Castro*, 609 F.3d 983, 994 (9th Cir. 2010) (*en banc*) (finding a

25  constitutional principle not "clearly established" under AEDPA where Supreme Court

26  expressly concluded it is an "open question").  In the absence of clearly established

27  Supreme Court law, habeas relief is unavailable to Petitioner on these grounds.

28

50

**C. Petitioner's freestanding actual innocence claim fails on the merits.**

Even assuming that Petitioner's actual innocence claim is not procedurally defaulted, and is otherwise cognizable as a freestanding claim, he fails to succeed on the merits. To prevail on an actual innocence claim, a petitioner must make a "truly persuasive demonstration" of actual innocence, which the Supreme Court has described as an "extraordinarily high" threshold. *Herrera*, 506 U.S. at 417. This standard is even higher than that required by the gateway standard described above, which can be articulated as "more likely than not, in light of the new evidence, [that] no reasonable juror would find him guilty beyond a reasonable doubt[.]" *House*, 547 U.S. at 538. Instead, a petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997).

As discussed above regarding Petitioner's gateway claim, the Bobino declaration falls far short of proving Petitioner's innocence. Instead, even with that declaration included, a reasonable juror would still have sufficient evidence to find that Petitioner was the shooter. Consequently, Petitioner's claim of actual innocence is substantively insufficient to exonerate Petitioner on the merits. Accordingly, Petitioner's actual innocence claim is denied.

## V.   There Is No Cumulative Error Here.

Finally, Petitioner argues that he is entitled to habeas relief under the theory of cumulative error. Am. Pet. at 83. Where there are constitutional errors in a defendant's conviction, but no one error, standing alone, is sufficient for reversal, such relief may nevertheless be appropriate because of the cumulative effect of the errors. *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). However, if "there is no single constitutional error in [a] case, there is nothing to accumulate to the level of a constitutional violation." *Mancuso*, 292 F.3d at 957.

Petitioner bases his cumulative error claim on the premise that "two or more of the above arguments established error." Am. Pet. at 83. This premise is mistaken. As

United States District Court
Northern District of California

1  explained above, Petitioner has not established a single constitutional error in his case.

2  Because there is nothing to accumulate into a constitutional violation warranting habeas

3  relief, Petitioner's cumulative error claim is denied.

4

5  **VI.  Petitioner May Appeal This Decision.**

6          A federal district court must issue a certificate of appealability appeal in order for

7  an appeal to be taken from a habeas corpus proceeding such as this one.  28 U.S.C.

8  § 2253(c)(1).  A court may only issue a certificate of appealability "if the applicant has

9  made a substantial showing of the denial of a constitutional right."  *Id.* § 2253(c)(2).  The

10  applicant does not need to show a likelihood of succeeding on the merits: "The question is

11  the debatability of the underlying constitutional claim, not the resolution of that debate."

12  *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003).

13          Although the Court has rejected each of Petitioner's claims for habeas relief, he has

14  nonetheless made a substantial showing of the denial of his constitutional rights.

15  Specifically, Petitioner has made a substantial showing of *Batson* violations for each of the

16  challenged jurors, ineffective assistance of counsel claims for his trial counsel's

17  performance regarding the testimony of Ms. Ard, Officer Fleming, Deputy DA Swalwell,

18  and Inspector Juanicot, and an actual innocence claim resulting from the newly discovered

19  Bobino declaration.  Petitioner put forward a significant amount of evidence requiring

20  serious consideration.  Accordingly, the Court finds that he has made the substantial

21  showing required to appeal this Order.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

52

1

**CONCLUSION**

2

For the foregoing reasons, Petitioner's petition for habeas corpus is DENIED.

3

Petitioner's requests for an evidentiary hearing and an oral argument are also DENIED.

4

This Order is certified for appeal to the United States Court of Appeals for the Ninth

5

Circuit.

6

7

**IT IS SO ORDERED.**

8

9

Dated:   02/04/15

_____

10

THELTON E. HENDERSON
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

53